No. 25,395.

MERLE BETTIS, a Minor, by M. BETTIS, Her Mother and Next Friend, *Appellee*, v. THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF WYANDOTTE, *Appellant*.

SYLLABUS BY THE COURT.

1. NEGLIGENCE—*Defective* Condition of County Bridge—*Notice to Chairman of Board of County Commissioners—Amendment of Petition—Excessive Verdict.* In an action to recover damages for injuries sustained by reason of a defective bridge, *held*: (*a*) the evidence was sufficient to support a finding that the bridge was wholly · or partially constructed by the county; (*b*) the evidence was sufficient to show the defective condition of the bridge; (*c*) the evidence was sufficient to support the finding that the chairman of the board of county commissioners had notice of the defective condition of the bridge more than five days before the injury; (*d*) no prejudice was shown by allowing plaintiff to amend her petition during or at the close of the trial; (*e*) that a verdict of $22,500 was excessive.

2. SAME—Various alleged errors considered and held not to be well founded.

Appeal from Wyandotte district court, division No. 3; WILLIAM H. Mc-CAMISH, judge. Opinion filed July 5, 1924. Affirmed as modified.

J. H. Brady, county counselor, and T. F. Railback, of Kansas City, for the appellant.

W. C. Rickel, and Arthur J. Stanley, both of Kansas City, for the appellee.

T. A. Pollock, of Kansas City, of counsel.

The opinion of the court was delivered by

HOPKINS, J.: The action was one to recover damages for injuries sustained by the plaintiff by reason of a defective bridge. Trial to a jury resulted in a verdict of $22,500 for the plaintiff. The defendant appeals.

The plaintiff's home was at Scandia, Kan. She was about nineteen years of age. July 1, 1922, she accompanied her parents on a visit to Piper, Kan., near Kansas City. On July 11, in company with an older married couple (Mr. and Mrs. Dickson), another young woman, and a young man, she drove to Kansas City, Kan. The party left their car and took an electric car to Kansas City, Mo. They returned about eleven o'clock, got in their car and started for Piper. They drove over the Reidy road, which was a main-traveled thoroughfare. It crosses Mill creek over what has been known as the Gable bridge or Jack's bridge. The bridge was about seventy-

five feet long. Its east end had caved in—collapsed. When they reached Mill creek, traveling at ten or twelve miles an hour, the car went into the creek; fell a distance of about eighteen feet and turned upside down on its occupants. Mr. and Mrs. Dickson, who occupied the front seat, were killed outright. The plaintiff suffered severe injuries, on account of which this action was brought.

1. The defendant denies liability. Its principal contention is that it did not either wholly or partially build the bridge; that the county took charge of the bridge long after its original construction, and has from time to time made only such repairs as appeared to be necessary. On this question there was introduced in evidence from the commissioners' journal of May 15, 1871, an entry showing, "On motion, Mr. English was authorized to let the contract for the building of a bridge on Mill creek on the Patrick Reidy road near William Jack's farm," etc. In 1880 the board ordered the township trustee to have the bridge repaired, and allowed a claim for repairs. In 1893 the board ordered that "J. G. Woodward and R. O'Donnell be and are hereby employed to raise the wing wall on said bridge two and one-quarter feet; cost not to exceed ten dollars." On July 22, 1918, the board adopted the county road system approved and prepared by the state highway engineer, including the Reidy road. R. E. Jacks testified that he worked on this bridge about twenty-five years before; helped to put new steel on the top, the steel from one end of the abutment across to the other, which remained on the bridge until the abutment fell down; working for the county, he had laid two feet of rock on the north wing and south wing of the east abutment; put in what he called "concrete masonry" on the northeast corner of the west abutment; built a retaining wall for this; that there was a wall built up on top of these old abutments to retain the bridge. The old abutments were not wide enough to sustain the bridge. There was a wall built that rolled out, and he put a wall out on the end so as to put the shoe of the west abutment and the end wall on the north side of the west abutment and made it extend south of the wall; that there was a steel structure placed over the old abutment. The old structure was fourteen feet roadway; the steel structure was sixteen feet roadway.

Robert Cahill, eleven years county superintendent of roads, testified that he put stringers and boards on the bridge at different times and put a concrete corner on it, which supported the west abutment from bottom to top, not so wide on the top, a little wider on the

bottom; that an old abutment had fallen down; that when the new abutment was constructed it was set back five or six feet on the east end; that it was a stone abutment about twenty feet high with retaining walls on each side eight feet long.

It may be said that the superseding of one pier by another of different dimensions and different material, the substantial increase in width, the new steel used, all made this a bridge, partially at least, constructed by the county. A mere repair of a structure in order to preserve it in its original form and size is quite different from so changing and adding to it that it is a different edifice. It is clear that this bridge was materially reconstructed by the county. In both dimensions and kind of material used it was made different from its original construction. It was doubtless originally constructed by the county. The evidence was sufficient to support the finding of the jury that the bridge was wholly or partially constructed by the county.

2. The defendant contends that there was no evidence showing that the bridge collapsed in consequence of a defect, or which, to any extent, proved the bridge was defective. On this point there was evidence that a large log in the stream turned the current against the east abutment which supported the bridge; that the creek bed had washed down below the bottom of the abutment; that there was a considerable hole under the abutment; that the base on which the abutment had rested had materially washed away. Mr. Jacks testified that at one observation the support of the abutment had washed out six inches below the bed of the creek. Later on, at his last observation before the abutment fell, the creek bed was lowered to between two and three feet below the bottom of the abutment.

A. G. Reeves testified that above this bridge in the creek on the opposite side lay a big log, a tree, that was turning the water against it—right against this abutment; right north of the abutment there was a pool of water.

Willis Reeves testified that the pier was in "mighty bad shape," just standing on a little dirt under it; that it was washed out from one side, had crumbled away from it; that the place under the abutment was big enough to put his boots and things under there. The testimony was sufficient to show the defective condition of the bridge.

3. It is contended that there was no evidence that the chairman of the board of county commissioners, Sam Clark, had notice of the

defect more than five days before the accident. There was testimony that Clark visited the bridge on two occasions a short time previous to the accident. One of the occasions was about three weeks previous. A contractor who was working on the bridge testified that he saw Clark there about three weeks before the accident; that Clark directed him to move some sand and other material farther back from the main-traveled part of the road; that on one occasion he met Clark on the bridge with somebody else; that Clark was on the north side of the bridge; that he (Clark) and the other man appeared to be looking at the creek; that they were facing in a northeasterly direction in the direction of the defective abutment; that Clark made some motions with his hands over the creek; that at the time he was standing and looking in the direction where the creek was flowing against the abutment; that he could see that from where he was standing; that anybody could see it. If the condition of the abutment was such as is shown by the record in this case—a condition patent enough for other people to observe—Clark, whose business it was to see, must have observed the condition. The evidence was sufficient, under the circumstances, to take the case to the jury.

4. It is contended that the court erred in permitting plaintiff to amend her petition after the evidence was practically all in. This was a matter lying in the sound discretion of the trial court. No prejudice is shown, and under the circumstances it cannot be said that the court abused its discretion.

5. It is contended that the verdict was excessive. The testimony showed that the injuries suffered by the plaintiff were serious, painful and some of them permanent. Five of her front teeth were knocked out. Her hip was crushed; her leg broken; her collar bone crushed; her throat lacerated, with other minor injuries. She was rescued from the wreck by neighbors, taken to a house close by, and later to the hospital. For eight weeks she lay on her back with a fifteen-pound weight attached to her leg. It did not heal properly and an operation was necessary. One of the surgeons testified that it was necessary to cut into the limb; that a ten-inch incision was made; that some of the muscular tissues impinged between the fragments of bone and interfered with normal action; that it became necessary to go in and dissect and denude some of the bone to put in a bone splint in order to get partial union. The bones had been calloused over the ends of the fracture where they had been broken;

that, "We had to take this callous—this deposit of osteoblast—out to make new bone; we had to take that off in order to get the bones together. There had been a partial knitting taken place, which interfered with the proximity of the bone; then placed on this bone splint with screws in the socket as a part of it. I think we used four bone screws, two in each end of the splint. She was on the operating table probably an hour and a half. The operation was serious. She showed a marked degree of shock. We were alarmed about her for several hours." The plaintiff was examined at the time of the trial. The same surgeon testified that, "From the position of the femur bone of the left hip, the hip bone is shortened from a half to an inch. It throws the hip joint to quite a marked degree down. The plaintiff walks with a limp, which condition is permanent. This condition may affect her health to quite a degree. It throws her pelvis out of line, producing curvature of the spine. It is bound to produce some effect upon the spine." While the injuries were of a very serious nature, the court is of the opinion that the verdict was excessive. The judgment is therefore reduced to $15,000, if the plaintiff will accept that amount; if she declines, a new trial is granted.

6. Complaint is made of the instructions—of the refusal to give some requested by the defendant, and of some that were given by the court. The general charge of the court sufficiently covered the matters in controversy. Other complaints have been considered, but we find no error which would warrant a reversal.

As modified, the judgment is affirmed.