No. 30,186.

CHARLES E. LEINBACH, *Appellee*, v. PICKWICK GREYHOUND LINES and ORVILLE L. THOMPSON, *Appellants*.

(10 P. 2d 33.)

Opinion filed April 9, 1932.

*J. E. McFadden, O. Q. Claflin, Jr.,* both of Kansas City, *Edmund H. McVey, Samuel R. Freet* and *C. A. Randolph,* all of Kansas City, Mo., for appellant Pickwick Greyhound Lines; *M. J. Healy,* of Topeka, for appellant Orville L. Thompson.

*Fred Robertson, Edward M. Boddington* and *J. O. Emerson,* all of Kansas City, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was an action for damages for personal injuries sustained by plaintiff and for the death of his wife and for the destruction of his automobile in a collision with defendants' passenger bus on a public street and highway in the outskirts of Lawrence.

The *locus in quo* was as follows:

Seventh street in Lawrence, otherwise known as U. S. highway 40, runs north and south in the eastern part of North Lawrence. Lyons avenue runs east and west, about two blocks north of the Union Pacific main line and parallel with the railway tracks. Lyons

avenue is a dirt street of usual width; Seventh street, or U. S. 40, is paved with an 18-foot concrete slab, with dirt shoulders five to seven feet wide on each side. The ground thereabout is level. On the east side of Seventh street is a slight depression for drainage, not deep enough to be called a ditch.

On a bright Sunday afternoon, July 13, 1930, defendants' passenger bus was proceeding northward on Seventh street on its regular intercity schedule. It had halted south of the railway, then crossed, gaining speed as it proceeded along the next two blocks. At the same time plaintiff's Dodge sedan, followed by three other cars, was proceeding southward, the Dodge in the lead. In the Dodge were plaintiff, Charles E. Leinbach, and a Mr. Stickel in the front seat, and plaintiff's wife and Mrs. Stickel in the rear seat. As the Dodge approached the intersection of Seventh street and Lyons avenue a Ford roadster carrying three young people came from the west and collided with the Dodge, causing it to whirl around and head towards the north on the east side of the slab, right in the path of the oncoming bus, which crashed into it. The Ford broke a wheel and landed on its side near the southeast corner of the intersection and caught fire. The occupants of the Ford were not seriously injured. Mrs. Leinbach and Mrs. Stickel were killed outright; Mr. Stickel died shortly afterwards, and the plaintiff Leinbach was severely, variously and painfully injured. His Dodge sedan was virtually destroyed.

This lawsuit was brought against the proprietor of the bus and its driver Thompson, seeking to hold them responsible for the consequences which followed the double collision.

Plaintiff's petition gave his version of the facts at length. His cause of action was predicated on the theory that the effects of the collision between the Dodge and the Ford had ceased before the collision between the bus and the Dodge, and that the latter collision could have been avoided if the driver of the bus had promptly applied his brakes when he first saw, or could have seen, the Dodge in the path of danger ahead of him. Plaintiff's charges of negligence against defendants were—

(a) Failure to turn the bus aside to avoid striking the Dodge;

(b) Failure to slacken speed and to bring the bus to a stop before the collision;

(c) Excessive speed, to wit, forty miles per hour;

(d) and (e) Operating bus at higher speed than permitted by city ordinance;

(*f*) Defective brakes on the bus;

(*g*) "The defendants were negligent in that the defendant Orville L. Thompson and the defendant Pickwick Greyhound Lines, Inc., through Orville L. Thompson, their agent, in charge of said bus, at the time of and for a long time before the time of the collision between the bus and the Dodge sedan, negligently failed to observe and comprehend the situation ahead of them, and the danger impending over the occupants of the Dodge sedan arising from the fact that the bus was driving rapidly toward the Dodge sedan while the same was in a position of peril from which the plaintiff and his wife were not able to extricate themselves."

Plaintiff prayed judgment for $10,000 as damages for the death of his wife; $500 for her funeral expenses; $1,000 for hospital bills paid or incurred in his own behalf; $50,000 for injuries, pain and suffering sustained by himself; and $600 for the demolition of his Dodge car—a total of $62,100.

Defendants' amended answer contained a general denial and a rehearsal of the facts according to their view of them—that the bus was being operated in a careful and prudent manner; that the bus was sixty feet away when the collision between the Ford and the Dodge occurred; that both the Ford and the Dodge were being driven at high and dangerous speed and at a rate in excess of that permitted by the city ordinance at the time they collided; that the effect of their speed and of the collision was such that the Dodge was turned over and thrown directly in front of defendants' bus, and that the accident occurred without fault or negligence on the part of defendants.

The cause was tried before a jury. The evidence was voluminous; the abstracts and exhibits extend to 300 pages; the briefs to 385 pages. The jury returned a general verdict in favor of plaintiff for the full amount prayed for, $62,100. They also answered certain special questions, chief of which read:

"2. When the impact occurred between the bus and plaintiff's Dodge sedan, was the bus traveling in third speed or gear? A. Third gear.

"3. At what maximum speed, in miles per hour, was the bus capable of traveling when in third speed or gear? A. Twenty-seven to thirty miles per hour.

"4. How far south of the south line of Lyons street was the rear end of the Dodge sedan when the bus and Dodge sedan collided? A. Eight or ten feet.

"5. How many automobiles, including the Dodge sedan, were on the west side of highway No. 40, in the block immediately north of Lyons street and traveling south, just prior to the collision between the Ford roadster and Dodge sedan? A. Four cars.

"6. Had the Dodge sedan come to a complete stop before the collision with the bus, or was it still in motion? A. Came to a complete stop.

"7. In what position was the Dodge sedan, at the time of collision with the bus, as to being upright on its four wheels, or lying on its side, or lying on its top? A. Being on its four wheels.

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"9. Did the driver of the bus use every appliance and means at hand that he could use, with safety to the passengers in said bus, to avert the collision with the Dodge sedan, after he saw the Dodge sedan in a position of danger? A. No.

"10. If you answer the preceding question No. 9 no, then state, with particularity, what he omitted to do. A. He failed to apply his brakes in time to avoid the collision, nor did he turn out to the right in time.

"11. Were the air brakes and emergency brakes of the bus in good condition and working order at and immediately prior to the collision between the Dodge sedan and the bus? A. Yes.

"12. Did the driver of the bus apply the air brakes and also apply the emergency brakes on the bus as soon as he knew that the Dodge was in his path, or coming into his path? A. No.

"13. After the driver of the bus saw the Dodge sedan in a position of danger, how far did the bus travel before it came to a stop? A. Eighty-six feet.

"14. If you find for the plaintiff, then state how much you allow the plaintiff:

"(a) For the death of his wife? A. $10,000.

"(b) For funeral expenses of his wife? A. $500.

"(c) For hospital, surgeon, and doctor bills? A. $1,000.

"(d) For plaintiff's own injuries? A. $50,000.

"(e) For damages to plaintiff's car? A. $600."

The trial court by remittitur reduced the jury's allowance for the Dodge car to $565, and eliminated $729.40 of the jury's award for plaintiff's hospital expenses, and approved the verdict in all other respects and entered judgment against defendants for $61,335.60.

Defendants appeal with thirty-seven specifications of error, some of which are subdivided. The more serious of these will be discussed as we proceed; others of less importance will have to be disposed of summarily for lack of space and time.

1. It is first contended that the verdict and findings charge plaintiff with continuing contributory negligence up to the time of the accident as a matter of law. Defendants direct our attention to the jury's finding that the Dodge car was not damaged by its collision with the Ford and that its occupants were not injured thereby. The jury found that the Dodge was standing on its four wheels when the bus drove into it. From these findings defendants argue that it was negligence as a matter of law for the Dodge to stand still on the east side of the slab waiting for the bus to drive into it, when

it might have gotten out of the way under its own unimpaired power. This situation furnished a fair talking point before the jury, but when we consider that the driver of the Dodge would need a few moments, at least, to decide what to do in such unusual circumstances, it cannot be said that contributory negligence was shown as a matter of law.

2. It is contended that the trial court erred in submitting to the jury an issue of negligence on the part of defendants in failing to discover the perilous position of the Dodge and its occupants in time to prevent a collision with the bus. The court instructed the jury that the question of defendants' negligence should be determined by the action of the bus driver after he saw, or could have seen, the Dodge car whirl over to the east side of the paved road. Defendants assert that the bus driver's duty did not require him to keep a lookout for such an unusual happening as that which occurred at the intersection. They contend that the bus driver owed no duty to plaintiff and his wife until he actually saw the Dodge in his path and realized its helplessness to get out of the way of the bus. On this point counsel cite *Maris v. Street Railway Co.*, 98 Kan. 205, 158 Pac. 6. In that case plaintiff was riding a motorcycle on a street in Lawrence. Trying to avoid a collision with defendant's street car he rounded a street corner too quickly and was thrown from his motorcycle and fell so close to the car line that the running board of the street car passed over him and he was dragged some distance. He brought an action for damages against the street-car company, charging it with negligence on the theory that the motorman *ought to have discovered* his perilous situation in time to have avoided the injury; but this court, citing earlier cases, held that the humanitarian or last-clear-chance doctrine does not apply where the negligence has to be predicated on the theory that defendant ought to have discovered plaintiff's danger in time to have avoided the injury but did not in fact discover it. However, we think this point of law is not important in this case because the bus driver testified that he saw the Dodge in front of him before it had quit moving. His testimony reads:

"As I approached Lyons avenue, the first thing I noticed there was an accident . . . There was the back end of a car I saw coming right in toward the motor of my car . . . I did not see the Ford strike the Dodge. The first thing I saw was the rear end of the Dodge. It was in motion . . . It was swinging around toward me . . . It seemed to be kind of half off its wheel and turning over towards its side."

While the bus driver stated that the bus was only fifteen or twenty feet away when he saw this event, the jury found that he was eighty-six feet away when he saw it, which fact makes it clear that the bus driver did see the Dodge at the moment it whirled across to his side of the road; and so the criticized language of the trial court's instruction relating to what would be his duty after the bus driver "by the exercise of reasonable care could have discovered the position of plaintiff's car" and other language to the same effect was nonprejudicial.

3. Error is predicated on the trial court's instruction that "if there was no evidence to the contrary" the jury should presume that the deceased driver of the Dodge car (Mr. Stickel) was not guilty of contributory negligence which caused the Dodge car to be upon the east side of the road, nor in his failure to extricate it from the path of the oncoming bus. The main criticism with this instruction is against the *lapsus linguæ* of the court by its use of the words "if there was no evidence to the contrary." Counsel for plaintiff seek to answer this criticism by asserting that there was in fact no substantial evidence that the driver of the Dodge was guilty of negligence. We cannot assent to that. There was the testimony of witnesses touching the negligent speed of the Dodge as it approached the intersection, likewise the negligent speed of the Ford which first collided with it. Part of that testimony was that the Dodge was traveling at a speed in excess of the city ordinance, and that at the same time its driver's view of cars approaching from the west was cut off by a house and other obstructions situated on the northwest corner of the intersection. Furthermore, it is too clear for cavil that there was negligence on the part of somebody, Ford driver, sedan driver, or both, which caused the first collision and which resulted in landing the Dodge and its passengers on the east side of the road. The court should have plainly instructed the jury that negligence *did* cause the first accident, that whether the fault or any part of it lay with the sedan driver was immaterial, but that the jury's concern was to determine whether the effect of that negligence which caused the first accident had ceased before the second collision occurred. We therefore hold that the trial court was not well advised in its use of the words "if there was no evidence to the contrary" in this instruction, but a majority of this court do not regard the error as so misleading as to be prejudicial.

4. Defendants' next contention is that the negligence alleged was

not the proximate cause of plaintiff's injuries and damages. The argument is that the collision of the Dodge and the Ford which whirled the Dodge over in front of the bus was the efficient cause. The case of *Johnson v. City of Omaha*, 108 Neb. 481, is cited in support of this point. But that case was only superficially like the one before us. Plaintiff's car was coming south. Another car coming from the west ran into it at a street intersection, which caused plaintiff's car to swerve to the east side of the street *into* and *against* the city's fire truck which was going north. Plaintiff was thrown from his car and killed. In that case, also, there was evidence which the jury believed that the first and second collisions happened so close together "as to be considered the same crash." The supreme court reversed a judgment against the city for damages for the death of plaintiff, saying—

"No reasonable mind could believe, under the conditions thus shown, that the driver of the fire truck did see, in time to have avoided a collision with the Johnson car, that said car was in his course, or that he should have seen or anticipated that the Johnson car was, or would be, thrown into his truck." (p. 493.)

In the Nebraska case the vital question of the length of time between the first and second collisions was settled by the triers of fact against the plaintiff. Here this vital matter was determined favorably to plaintiff.

5. The next point urged by appellants is that at the close of all the testimony there was no evidence to show that no injury had happened to plaintiff and his wife in the first collision, and that the jury had nothing on which to base its conclusion that all the injury, death and damages were caused by the second collision, and that the court should therefore have directed a verdict for defendants. We cannot assent to this contention. There was evidence that the Dodge car was standing upon its four wheels on the east side of the slab and headed north, with nothing apparently the matter with it. The Ford car broke a wheel which caused it to collapse on the east side of the road and catch fire, but its three occupants were not much hurt by that mishap. So, assuming the truth of the testimony touching the lack of apparent harm to the Dodge by the first collision, it would not do for the trial court to take the case from the jury for want of positive proof that the first collision had wrought no injury to plaintiff and wife. In *Lane v. Insurance Co.*, 113 Kan. 365, 214 Pac. 92, the rule stated in 23 C. J. 49 was quoted approvingly. It reads:

"But there is also authority for the view that it is sufficient for the party having the burden of proof to make out the more probable hypothesis, and that the evidence need not rise to that degree of certainty which will exclude every other reasonable conclusion."

6. Defendants also complain of the admission of testimony touching the sturdiness of Dodge sedan cars and that they will not collapse by being capsized. There is little merit to this point. Courts are inclined to look with favor upon experimental evidence and tests of relevant occurrences. These need not be exactly similar to the occurrence which the jury has under consideration; the degree of similarity must be taken into account in weighing its probative force; but if the similarity of conditions is slight the evidence of the test of experiment has little evidentiary significance and the trial court may properly rule it out altogether. This subject was considered at some length in *Johnson v. Railroad Co.*, 80 Kan. 456, 103 Pac. 90. See, also, 1 Wigmore on Evidence, 2d ed., 780-790; 22 C. J. 755, 758, 759. The evidence objected to in this case may have had little or no probative value, but it cannot be judicially declared that it was prejudicial.

7. Error is also assigned on the exclusion of evidence tending to impeach the candor and veracity of Irwin, the plaintiff's principal witness. Irwin was a passenger on the bus at the time of the accident. He testified that the bus was 125 feet away when the first collision occurred; that he observed that when the bus was 90 or 100 feet away the driver of the bus had done nothing to change its direction or course; and that at the time the Dodge stopped it was on its four wheels; and that the bus was only 25 or 30 feet from the Dodge when he noticed any slackening of its speed. The general effect of Irwin's testimony was to make a rather strong case of negligence against the defendants. On cross-examination defendants sought to elicit the fact that his testimony was inconsistent with a statement he had made at the time of the accident. In that statement Irwin had given his name and address, and answered questions:

"Were you injured? If so, what injuries did you sustain? Slight bruise on chin.

"Who do [you] consider to blame for accident? Driver of Ford.

"Reason? Coming from east [west], ran into Dodge."

. . . . . . . . . .

[COUNSEL FOR PLAINTIFF]: "We object to the paper as not purporting to state a fact in this case or tending in any way to contradict any fact to which the witness testified, and it is a mere conclusion.

"By the Court: It is wholly immaterial in this case. It is immaterial to the issues and does not tend to contradict anything so far. The objection is sustained."

Neither the objection nor the ruling was correct. The statement was not offered as evidence relating to the liability of the Ford driver, nor as bearing on the liability of the defendants, but merely to show that Irwin had made a prior statement in relation to the accident which was inconsistent with the testimony he was then giving at the trial. Under elementary rules of evidence the fact that he had made such inconsistent prior statement was admissible. In *Holland v. Railroad Co.*, 112 Kan. 609, 212 Pac. 90, the action was one to recover damages resulting from a collision between a Ford car and a railway switch engine. Plaintiff's case rested largely on the question whether there was a proper headlight on the engine. The railway conductor testified that the engine was fully equipped with an electric light and that it was burning when the collision occurred. It was shown, however, that the night of the accident he had stated to a witness: "We had a damn poor headlight. . . . We had been having trouble with this light ever since we left Nevada." (p. 615.) On appeal the railroad company contended that the statement was incompetent, but this court held that it was admissible for the purpose of impeaching the conductor as a witness.

This precise question arose in *Judson v. Fielding*, 237 N. Y. Supp. 348, which was an action for damages for the death of plaintiff's husband in an automobile which collided with a passenger bus. One Walsh, principal witness for plaintiff, had been a passenger in the bus and gave testimony tending to show that improper driving of the bus was to blame for the accident. On cross-examination he was asked if he had stated to a highway patrolman immediately after the accident "that the bus was not to blame." Objection to this question was sustained. The appellate division of the supreme court held that this ruling was harmful error which required a reversal of the judgment in plaintiff's favor and that a new trial be ordered. In the opinion the court said:

"In considering the evidence so sharply in dispute, the jury was entitled to know the contrary views the witness had expressed when the incident was fresh in his mind, uninfluenced by sympathy or other cause. Very often by calm reflection a witness may correct inaccurate observations or erroneous impressions hastily formed. But the jury should have all the facts in making an

appraisement of the value and weight to be given the testimony. It is quite possible that with the credibility of the principal witness shaken, a different result would have been reached." (p. 352.)

In another damage suit, *Uggen v. Bazille & Partridge,* 123 Minn. 97, it was held:

"Prior statements of a witness inconsistent with his testimony are admissible for the purpose of impeachment, although they state what he understood instead of the facts upon which such understanding was based, and it was error to exclude such statements." (Syl. ¶ 3.)

In an action for the negligent death of a workman, the same question was considered by the supreme court of Kentucky and it was held that the exclusion of evidence showing prior inconsistent statements of a material witness constituted reversible error. The pertinent syllabus reads:

"Where witness testified that there was hanging slate at place where plaintiff's intestate was killed, but prior to trial he had signed statement that it was his honest opinion that deceased was hurt because he raised himself too high while riding in bank car, such statement, though merely expressing an opinion, being inconsistent with his testimony was competent to destroy or weaken latter and exclusion thereof was error." (*Rockport Coal Co. v. Barnard, Admrx.,* 210 Ky. 5, syl. ¶ 5.)

In discussing the competency of evidence to show that a witness has made prior statements inconsistent with the testimony he has given on the witness stand, Professor Wigmore (2 Wigmore on Evidence, 2d ed., 492, 493, 495) says:

"The purpose is to induce the tribunal to discard the one statement because the witness has also made another statement which cannot at the same time be true (*ante,* § 1017). Thus, it is not a mere difference of statement that suffices; nor yet is an absolute oppositeness essential; it is an inconsistency that is required. . . . As a general principle, it is to be understood that this inconsistency is to be determined, not by individual words or phrases alone, but by the *whole impression or effect* of what has been said or done. On a comparison of the two utterances, are they in effect inconsistent? Do the two expressions appear to have been produced by inconsistent beliefs?

. . . . . . . . . . . . . . . . . . . .

"The *form* of the supposed contradictory assertion is immaterial. It may be oral or written; it may be an ordinary letter, or it may be a sworn statement, as, for example, a deposition, or an oral repetition of a written statement already proved.

. . . . . . . . . . . . . . . . . . . .

". . . In short, the only proper inquiry can be, Is there within the broad statement of opinion on the general question some implied assertion of fact inconsistent with the other assertion made on the stand? If there is, it ought

to be received, whether or not it is clothed in or associated with an expression of opinion. As a matter of precedent, the rulings vary more or less in the results reached; most of them are vain quibbles."

See, also, *Higgs v. State*, (Ark. 1924) 264 S. W. 859.

This court holds that the prior statement of Irwin, being, as it was, seemingly inconsistent with his testimony on the witness stand, was competent for the purpose of impeachment, and its exclusion was erroneous and prejudicial.

8. The next error urged on our attention relates to the trial court's refusal to grant a new trial on newly discovered evidence tending to impeach the veracity of the witness Irwin. Irwin had represented himself to be a graduate of Princeton University and a doctor of philosophy. He was the only witness who testified positively that the Dodge car was standing on its four wheels when the bus drove into it. With one other exception the plaintiff's witnesses testified that the Dodge was lying on its side or on its back when the bus drove into it. The one other witness for plaintiff, Kenneth Peters, who did not so testify, made a demonstration with models to show the jury the position of the two automobiles after the first collision. His testimony reads:

"I did not see the Ford turn over. . . . I did not see the Dodge car turn over, and I didn't see the Dodge car turn off its wheels until after the bus had struck it. . . . And the Dodge was upside down then. . . . From the time the Dodge and Ford came together until the bus and the Dodge came together was all so quick you couldn't hardly believe it—as quick as you could snap your finger—instantly. They came together and were standing and swinging up and down on a bounce, and immediately they were struck by the bus."

Disregarding the testimony of all the eye witnesses for defendants, of whom there were several, and all of whom testified that the Dodge was thrown in front of the bus on its side or on its back—since the jury had the right to disbelieve them—the plaintiff's other eyewitnesses to the collision testified as follows:

Miss McManus: "When I got out of the Ford it [the Dodge] was still on the slab lying on its top just west of the Ford."

Claude B. Minor: "The Dodge car had stopped just a little south of the point where the Ford lay in the ditch when it stopped and at that time the Dodge was on its back. . . . I am certain that the Dodge car was turned over on its back before the bus ran into it."

In rehearsing this evidence this court has no purpose of taking upon itself the task of appraising the credence which should be given to witnesses whom we have not seen. But this testimony was given

by plaintiff's witnesses. Some of the physical facts tended to show that the Dodge could not have been standing on its four wheels when the bus struck it—particularly a dent on the housing in the center of the rear axle of the Dodge, which must have been made by the bus, and yet it is very difficult to imagine how the bus could have made that dent unless that rear axle of the Dodge was upended or the Dodge was upside down when the bus struck it. Moreover, it is hard to understand, if the Dodge was standing on its four wheels and undamaged by the first collision, why the Dodge was not propelled forward rather than utterly crushed when the bus bumped into it. These considerations show how vital to plaintiff's cause and fatal to the defense was Irwin's testimony. In support of the motion for a new trial, it was shown that Irwin had falsified when he represented himself to be a doctor of philosophy and graduate of Princeton University. It was also shown by affidavits of people who knew him that his reputation for truth and veracity was not good. In fairness to Irwin, however, it should be noted that there were also counter affidavits that his reputation as a truthful man was good. Counsel for plaintiff now say—

"So far as Dr. William S. Irwin is concerned, he could be eliminated as a witness in this case, and there was ample evidence from witnesses Kenneth Peters, Claude Minor, and Miss LaVerne McManus, and the physical facts in this case for the jury to reach the conclusions of fact which they did."

We have above rehearsed the most important features of the testimony of these witnesses and must hold that a verdict for plaintiff resting exclusively on their testimony could not stand. Counsel for defendant would now minimize the false testimony of Irwin touching his standing as a scholar and clergyman, but in addressing the jury Irwin's self-asserted prestige was emphasized in dramatic fashion. Counsel for plaintiff while addressing the jury apostrophized opposing counsel thus:

"Now, . . . let me take your position. You say Doctor Irwin, that graduate of Princeton, that Presbyterian minister, chairman of the Beloit Hospital Association; you say he comes here, and that he is mistaken, that Mr. Irwin didn't know what he was talking about . . . Doctor Irwin told you how he discovered what his position was, . . . and he came in like a gentleman and the Christian man that he is, and told us how it happened, and now if they cannot tangle him up they want to get away from him."

In view of the showing which tended to discredit Irwin as a witness and the further fact that Irwin had made a statement touching the cause of the tragedy at the time it occurred which was incon-

sistent with his testimony given at the trial, the approval of a verdict for $60,000 which necessarily rested so largely on his testimony involved a very serious responsibility on the trial court. But for reasons which otherwise appear in this opinion we need not decide whether this one phase of the case would require a reversal of the judgment.

9. Defendants find fault with the form of general verdict which the trial court submitted to the jury. But we see nothing the matter with it, and neither apparently did the defendants at the time it was given to the jury, for they made no objection to it at that time, and the questions to develop the special verdict or special findings of the jury were prepared by counsel for defendants.

10. Error is also predicated on the exclusion of a written statement made by defendants' witness, J. W. Glidden, which he had made for the use of counsel for plaintiff shortly after the accident. Excerpts from that statement were introduced to show that it was inconsistent with his testimony at the trial, which was quite proper, as we have shown above in dealing with the excluded prior inconsistent statement of Irwin. The record reads:

"THE COURT: The court cannot order the statement be submitted. The witness is here in court."

[COUNSEL FOR DEFENDANTS]: "Then I move that all testimony with respect to this statement be stricken from the jury and the jury instructed to disregard it.

"BY THE COURT: Overruled."

In view of the foregoing it seems clear to this court that defendants were entitled to have the fact or insinuation of the witness' inconsistent statements cleared up either by having the statement introduced so that it might speak for itself, or that all reference to it should have been stricken out.

11. Defendants also make complaint against a ruling of the trial court in respect to the testimony of defendants' witness Evans, who had been a passenger on the bus when the accident occurred. He testified to various details of the accident, including the fact that the Dodge was upside down and its four wheels in the air when the bus collided with it. Counsel for plaintiff had procured from this witness a lengthy statement about the accident. Plaintiff was permitted to read that statement to the jury. One part of it had originally recited that following the first collision, when the Dodge landed near the southeast corner of the intersection it "was upside down."

The words "was upside down" were scratched out. In response to a question by counsel for plaintiff the witness was not permitted to explain the statement, but required to answer whether he had made it with a categorical "yes or no." He answered: "Yes, through influence." The trial court ruled that the witness might explain what he meant, and in the absence of the jury the witness testified that Mr. Boddington had told him what other witnesses said as to the speed of the bus, and showed him maps and pictures and "tried to impress [me] where it [the second collision] couldn't be this way and couldn't be that way, that was what I wanted to explain." However, this matter was not followed up with some such explanation by the witness when the jury was recalled, so it cannot be said that prejudicial error occurred; but we cannot but marvel why such wide latitude was given to discredit witnesses for defendants and to limit their explanatory statements of whatever inconsistencies may have existed between their statements made shortly after the accident and the testimony they gave at the trial, while the inconsistent statement of plaintiff's witness Irwin which he likewise made the day of the accident was ruled out.

12. Defendants make many objections to the instructions which the court gave to the jury. We have already held that the court erred in the casual way it dealt with the negligence which caused the first collision; also the technical error touching the duty of the driver to discover the perilous situation of the Dodge and its passengers before he did discover it. It is contended that the court's instructions gave the jury a roving commission to convict defendants of negligence on any ground whether pleaded or not. We do not concur in this criticism. One instruction to which exception is taken reads:

"The degree of care required of both the plaintiff and the defendants in this case, in the operation of their respective vehicles, was what is termed reasonable care. Reasonable care is such degree of care for the avoiding of collisions, as a reasonably prudent and careful driver of such vehicles would exercise under all the surrounding circumstances as disclosed by the evidence. Care, which would be reasonable under one set of circumstances, might not be such under all circumstances. (One set of circumstances might demand but slight care and yet be termed reasonable, while another might demand the highest possible degree of human skill and foresight in order that it may be termed reasonable.) In order to determine whether reasonable care was used by the operators of the vehicles involved in this case, the nature of the vehicle, as to size, weight and manner of construction and control, the nature of the roadway, the extent and nature of travel thereon, the likelihood of

emergency calling for quick action, or the absence thereof, in view of the entire evidence should be taken into consideration by the jury."

The next succeeding instruction should be read and considered with the one above. It reads:

"If a driver of a vehicle is confronted by a set of circumstances which call for quick action, without time for deliberation, and he uses his best judgment and follows the course of action which seems to him best suited to prevent a collision, he cannot be found to have been negligent simply because he did not do what some other person might have done if placed in the same position and confronted by the same set of circumstances."

We think these two instructions constituted a fair statement of pertinent law. (*Arrington v. Horner*, 88 Kan. 817, 129 Pac. 1159. See, also, *McDonald v. Yoder*, 80 Kan. 25, 101 Pac. 468; *Super v. Modell Township*, 88 Kan. 698, 701, 129 Pac. 1162; *Bean-Hogan v. Kloehr*, 103 Kan. 731, 175 Pac. 976.) The statutory rule (R. S. 1931 Supp. 8-122) governing the requisite degree of care in driving motor vehicles on public highways and city streets is in accord with the pertinent legal principles of due care which the courts have worked out independent of statutes. These rules of law are imperatively necessary for the protection of life, limb and property in this age of growing congestion of motor traffic, and the trial court's instructions Nos. 4 and 5 are approved. One criticism of the instructions was based on the trial court's assumption that Stickel was driving the sedan at the time of the accident, the contention being that there was no evidence of that fact. The point is unimportant, but we think the position of Stickel's body crushed beside the steering wheel was convincing evidence. The many other criticisms of the instructions have all been carefully examined, but we discern nothing further on this phase of the appeal to warrant discussion. Neither do we find just ground for complaint in the refusal of the trial court to give certain instructions requested by defendants.

13. Coming next to the error based upon the excessive verdict after modification by the trial court, $62,100, defendants have a just grievance thereat. Surely this jury had a poor conception of money values, or were obsessed with the idea that a bus company has a storehouse of treasure like an eastern potentate in the "Arabian Nights," ready to pay over on the nail whatever sum as damages the caprice of a jury may determine. $62,100! The bus which figured in this tragic affair was a 29-passenger vehicle. If it had a full load of passengers and had a net profit of two cents per mile

for every one it hauled, that bus would have to travel 107,241 miles, or five times around the world in this latitude, to earn enough money to pay this judgment. With the same number of passengers it had the day of the accident it could not earn such a sum in a round trip as far as from Lawrence to the moon.

These illustrations of ours may seem grotesque, but it seems necessary to make the matter as plain as a barn door in order to demonstrate how unreasonable was the size of this verdict. It may be quite true that plaintiff was severely, dangerously and painfully injured and that he will never again be the man he was; and if so he is entitled, of course, to very substantial damages against the proven wrongdoers; but this court has had to deal with many cases of severely and permanently injured persons, and hitherto it has steadfastly set its face against the perversion of a cause of action for personal injuries into a *letter of marque* to plunder the treasury of a corporation. Laying aside the other errors complained of, this court is bound to hold that the verdict in this case is grossly excessive by all the determinants available. In *Fenn v. Kansas Gas & Electric Co.*, 118 Kan. 131, 134, 234 Pac. 7, it was said:

"'Error based on an excessive verdict and judgment is seldom an easy question for an appellate court to solve, and it is peculiarly difficult where the sum allowed is for pain and suffering. Of course, rules for dealing with excessive verdicts are not altogether wanting; if on reading the record the conscience of the court is shocked at the verdict, a remittitur or reversal is ordered; but there is no uniform yardstick, no hard and fast rule, by which the excessiveness of a verdict can be measured and determined as in ordinary mathematical calculations.'"

See, also, *Hardwick v. Railways Co.*, 114 Kan. 843, 845, 220 Pac. 1043.

Frequently the vice in an excessive verdict can be cured by a remittitur consented to by the prevailing party, as in *Fosche v. Traction Co.*, 108 Kan. 585, 196 Pac. 423; *Akins v. Railway Co.*, 109 Kan. 474, 199 Pac. 464; *Whitesell v. Street Railway Co.*, 115 Kan. 53, 222 Pac. 133; *Stone v. City of Pleasanton*, 115 Kan. 378, 223 Pac. 312; *Bettis v. Wyandotte County*, 116 Kan. 568, 571, 572, 227 Pac. 533; *Tartar v. Missouri-K.-T. Rld. Co.*, 119 Kan. 738, 742, 241 Pac. 246; *Stroup v. Northeast Oklahoma Rld. Co.*, 122 Kan. 587, 253 Pac. 242; *Ellis v. Kansas City Public Service Co.*, 131 Kan. 555, 292 Pac. 939. But the rule is well established that where the vice

of an excessive verdict cannot be cured by remittitur a new trial must be granted. Such a situation arises when the verdict has manifestly been given under passion and prejudice. (Civ. Code, § 305, R. S. 60-3001; *M. K. & T. Rld. Co. v. Weaver,* 16 Kan. 456; *K. P. Rly. Co. v. Peavey,* 34 Kan. 472, 8 Pac. 780.) In *A. T. & S. F. Rld. Co. v. Cone,* 37 Kan. 567, 15 Pac. 499, the plaintiff sued for $50,000 for personal injuries. The jury gave him every cent he asked. The trial court ordered a remittitur of $25,000, which the plaintiff consented to, but this court would not countenance a judgment rendered under such circumstances and remanded the cause for a new trial. Speaking by Mr. Justice Valentine, this court said:

"Evidently the jury acted either under a misconception of their duties, or under the influence of passion or prejudice; and probably under both. . . . Evidently when the court below required the plaintiff either to remit $25,000 of the damages found in his favor, or to take a new trial, the court must have found that the verdict of the jury was rendered under the influence of passion or prejudice. And certainly if one-half of the verdict was rendered under the influence of passion or prejudice, . . . It may be that this passion or prejudice affected the entire verdict and also the special findings, and caused the jury to find in favor of the plaintiff, where, except for the passion or prejudice, they could not have found in his favor at all." (p. 578.)

An analysis of the constituent parts of this verdict is not reassuring that it was free from passion and prejudice. The jury not only allowed the maximum figure, $10,000, for the death of the woman, but threw in another $500 for funeral expenses. It allowed $600 for damages to plaintiff's car, when counsel for plaintiff in his closing argument to the jury indicated that $500 would be plenty. The allowance of $50,000 for plaintiff's injuries so obviously indicates passion and prejudice as to shake the confidence of a reviewing court in the jury's sincerity in dealing with the other questions requiring their determination. And particularly does it shake confidence in those findings which are based so largely on the testimony of Irwin as against the plaintiff's other witnesses as well as the witnesses for defendants. In another respect this court gets the impression from the record that defendants did not have a fair trial. In its first answer counsel for defendants inadvertently pleaded that the bus was 100 feet away when the collision of the Ford and the Dodge occurred. By leave of court, defendants were permitted to correct and amend that estimate to 60 feet, but throughout the trial plaintiff was permitted to refer to the 100-foot estimate as if it continued to be a damaging admission of defendants. This was quite

unfair, and should not have been permitted. Another point: plaintiff's petition alleged that the bus was traveling at forty miles an hour. As the trial progressed, it became necessary to slow down the speed of the bus, because if it were only 86 feet away when the Dodge first appeared on the east side of the slab and the bus was traveling at forty miles an hour, there would be less than two seconds available for the bus driver to visualize the scene, the possibility of danger, to decide what to do, and to do it to avert or minimize the second collision. But plaintiff was not held to his pleading as to the speed of the bus and the jury graciously reduced its speed to that of third gear (findings 2 and 3) so as to give the driver of the bus time to stop it or turn out into the shallow swale on the right (finding 10) if he had been duly attentive to his business.

This court concludes that the judgment cannot stand; and a majority of the court also concludes that the record would not warrant a reversal limited to a determination of a proper allowance for plaintiff's damages. The judgment is therefore reversed and the cause remanded for a new trial on all issues involved.