No. 30,845.

MINNIE ROBERTS, as Administratrix, etc., *Appellee*, v. THE SAINT LOUIS & SAN FRANCISCO RAILWAY COMPANY, *Appellant*.

(18 P. 2d 167.)

Opinion filed January 28, 1933.

*E. T. Miller*, of St. Louis, Mo., *Henry S. Conrad, L. E. Durham, Hale Houts* and *Ilus M. Lee*, all of Kansas City, Mo., for the appellant.

*Frank M. Sheridan, Bernard L. Sheridan*, both of Paola, *L. Perry Bishop*, of Osawatomie, *S. L. Trusty* and *Edward E. Pugh*, both of Kansas City, Mo., for the appellee.

The opinion of the court was delivered by

BURCH, J.: On the night of September 12, 1921, Frank Earl

Fergus was acting as night agent of the St. Louis & San Francisco Railway Company, at the station of Paola. With him in the depot was the night telegraph operator, E. E. Belman.

The depot is about half a block south of a street extending east and west and crossing the railway tracks which extend north and south. The depot platform extends northward to the street. The tracks are east of the depot. The first track east of the depot is the southbound main track; the next is the northbound main track; the next is the passing track, and the next is the house track. Near the street and east of the house track is a freight house. South of the depot and on the west side of the tracks is a coal chute. South of the coal chute is a water tank. Some distance south of the water tank is a signal tower at a crossing of the Missouri Pacific railway track. Still farther south is a tool house. The tool house is about three-eighths of a mile south of the depot, and opposite the tool house are but two tracks, the northbound and southbound main tracks.

About 2 a. m. a northbound freight train came into the yards and stopped with the rear end south of the tool house. Soon afterward the conductor came into the depot. He was followed by the rear brakeman, Robert V. Clapper, who was somewhat excited. Clapper told Fergus he had been held up, and said, "They got my watch and money." Clapper asked Fergus to call the sheriff. Clapper also said the tool house had been broken into; he could see the tool house door was open, and the robbers came out of the tool house.

Fergus called the sheriff, George Lamm, by telephone. Fergus told the sheriff there had been a holdup down at the tool house, and the tool house had been broken into. Fergus asked the sheriff to come down, and said if the sheriff could get there within fifteen minutes he would hold the train. Fergus gave the sheriff something of a description of the robbers, and said if the sheriff would get there the brakeman and conductor would give more information. The sheriff said he would try to get there. After telephoning to the sheriff, Fergus turned to Clapper and told him to wait a few minutes, the sheriff would be down right away.

After telephoning the sheriff, Fergus telephoned the section foreman, Jess E. Roberts. Roberts had charge of the tools and equipment kept in the tool house, and it was part of his duty to protect them. Some of the tools and implements could be put to mischievous uses. Fergus said to Roberts, "Your tool house has been

broken into; better come down and close it up and attend to things." Roberts said all right, he would be right down.

After the robbery the train moved up so the caboose was between the depot and the freight house, and the train waited until the sheriff came. The sheriff arrived about fifteen minutes after he was called, and had his deputy, Doan, with him. The sheriff talked with the trainmen at the caboose, and after the conversation the train went on its way, northbound. After the conversation the sheriff went southward, walking between the second and third tracks from the depot. As the sheriff passed opposite the depot he waved to Fergus. Fergus was standing in the depot office door, saw the sheriff and his deputy going southward, and observed that one of them waved to him. There was no conversation. The night was very dark, and it was drizzling.

Some time after the sheriff had gone southward, Fergus said possibly twenty minutes afterward, the section foreman, Roberts, came to the depot. He was accompanied by his father. Fergus had some conversation with Roberts. Roberts asked if the tool house had been broken into, and Fergus said yes. Roberts said he was glad he had been called, and asked, "Did they get the motor car out?" Fergus replied he did not know. Roberts said, "I guess we will go down to the tool house," and went out of the depot.

Some harm befell Roberts, and the jury returned a verdict against the railway company for consequences of the harm, based on negligence of Fergus.

Roberts knew the tool house had been broken into, and he had been called in the nighttime to protect the property under his care. Whatever risk there was of encountering those guilty of the malfeasance was as apparent to him as to Fergus. Leaving that risk at one side, the elements of liability to be established were: First, Fergus realized, or should have realized, that in going to the tool house Roberts would encounter danger; not necessarily the particular danger he did encounter, but that there was risk of harm if Roberts went down there. Second, that Roberts did not, or likely would not, realize the danger. Third, that Fergus realized, or should have realized, that he could prevent the harm. Fourth, that Fergus neglected to exercise his power to prevent the harm and do what was proper for the protection of Roberts. These elements of liability must be found in the foregoing narrative.

In appraising Fergus' conduct, retrospective perception of the na-

ture and demands of the occasion is not permissible. After an event it is frequently easy to see that the doing of some act, or omission to do some act, might have prevented what occurred. In tracing causal relation between negligent conduct and consequence, the whole series of events may be examined. Causal relation, however, is unimportant until negligence has been established, and whether an act or omission was negligent depends on what the actor realized, or, as a reasonable man should have realized, at the time the conduct to be appraised was manifested.

The reader who, without other knowledge of the facts of the case, has perused this opinion thus far, is in possession of the whole situation as it presented itself to Fergus. There can be no dispute it was proper that the sheriff should be called to apprehend the robbers and that the section foreman should be called to protect the railway company's property. What portent was there which Fergus should have realized, and what should Fergus have done or omitted to do to prevent harm? The standard by which Fergus' conduct must be measured is that of a reasonable man. Surmise, conjecture and speculation are forbidden; and the court has no hesitation in saying legitimate answers to these questions would not occur to just a reasonable man, placing himself in Fergus' position. Lawyers skilled in discovering grounds for charging corporations with negligence of their employees are given the customary three guesses as to what made Fergus guilty of actionable negligence.

It so happened the sheriff shot and killed Roberts near the tool house, and the jury found specially the negligence which caused the homicide consisted in failure of Fergus to notify the sheriff that Roberts would be in that vicinity.

After the train came in and stopped, the rear brakeman walked forward along the west side of the train, inspecting it. When he reached the tool house, three men came out of the tool house and robbed him. When the sheriff arrived the brakeman told the sheriff what had occurred. After the conversation with the brakeman the sheriff and his deputy went to the tool house. They found the tool house doors were open, and there were indications men had been lying in the tool house. After inspecting the premises the sheriff and his deputy sat down on a timber at the tool house. About fifteen minutes after the sheriff arrived at the tool house two men approached, one walking about ten feet ahead of the other. The

sheriff ordered the men to halt and throw up their hands, and said, "This is the sheriff." The men kept coming, and the sheriff again ordered them to throw up their hands, and said, "This is the sheriff." The sheriff turned his flashlight on the man in the lead. The man's hands were at his sides, and in his right hand was a 38-caliber pistol. The men did not stop. When there was but one railroad track between the man in the lead and the sheriff, the sheriff ordered the man to put up his hands and to put them up high, and said, "This is the sheriff." The deputy sheriff, who was four or five feet from the sheriff, also called to the men, told them to halt and to put up their hands, and told them who the officers were. At the third command of the sheriff, the man in the lead raised his pistol quickly to a point above his hip or waist. The sheriff testified he did not think the man's left hand moved. The sheriff testified the pistol looked to him as big as a cannon; he thought he was dealing with a desperado; and the reason he fired was, he thought if he did not do so, it was about his last show. The man's pistol fell to the ground. The man fell forward, and the man behind the one who was shot—Robert's father—cried out, "You have shot my son." The deputy sheriff picked up the pistol and handed it to the sheriff. The sheriff put the pistol in his overcoat pocket, and in a very short time it was discharged in the sheriff's pocket, doubtless having been cocked while Roberts held it. Roberts was somewhat hard of hearing. The sheriff's commands were all given in a loud voice.

The jury returned the following special findings of fact:

"1. Q. Did Jess E. Roberts, the deceased, have information to the effect that the sheriff was looking for the robbers and burglars? A. No.

"2. Q. Not submitted.

"3. Q. Did the sheriff shoot the deceased because he saw the deceased armed with a revolver? A. Yes.

"4. Q. Did the sheriff shoot the deceased only after he, the sheriff, thought his own life was in danger? A. Yes.

"5. Q. Do you find that the shooting of the deceased was caused by negligence on the part of the defendant? A. Yes.

"6. Q. If your answer to question No. 5 is yes, then state in what the negligence consists. A. By railroad employees not notifying sheriff that Mr. Jess E. Roberts would be in that vicinity.

"7. Q. Did any employee of the defendant railway company know that the deceased, Jess E. Roberts, had and was carrying a revolver on the night in question? A. No."

The action was commenced by the widow of the deceased, Minnie E. Roberts, as administratrix of his estate. The contention of plaintiff is that the railway company sent the sheriff to the tool house and so, in effect, laid a trap for Roberts. In brief and supplemental brief it is said the railway company planted the sheriff at the tool house. There is no basis in the evidence for the contention.

Fergus did not call the sheriff on his own initiative, and did not call the sheriff to guard the company's tool house or its contents, or to do anything else there. The custodian of the tool house was later called to look after the tool house. The sheriff was called at the request of the brakeman who had been robbed of his watch and money. Calling the sheriff had no more relation to railway business than if the man who made the request were not a railway employee. The business of the sheriff was official business as a public officer notified of the commission of a crime—discovery and arrest of criminals.

The only conversation Fergus had with the sheriff was by telephone. When the sheriff arrived at the station he did not go to the depot. The train had waited for him, and he went directly to the trainmen at the caboose. After the sheriff talked to the trainmen, he did not go to the depot. He started southward, which was in the direction of the scene of the crime. Fergus saw the sheriff walking down the tracks, and the sheriff saw Fergus standing in the depot office door. The sheriff waved to Fergus, but there was no conversation. Distance from the depot office door across the platform to the tracks, across the tracks, and across the spaces between the tracks, was not established. Fergus said the sheriff was 75 or 80 feet from him. All Fergus knew was that the sheriff was walking southward. He could not know, and was not required to prognosticate, what the sheriff's activities might be in trying to find the robbers. Fergus might suppose the sheriff would go to the scene of the crime to pick up clues, but whether the sheriff would go directly, or after time and circuit, Fergus could not know. All Fergus knew about the tool house was that it had been broken into. He could not know the conditions which the sheriff subsequently found there. Fergus could not know whether, after the holdup, the robbers would stay or go. A natural inference would be that they would scatter and flee. If the sheriff should go directly down there, Fergus could not know what the sheriff

would do next. If the sheriff did not find the robbers at the tool house, a natural inference would be that he would take swift measures to prevent escape. But Fergus could not foresee or foretell what the sheriff would do, and Fergus was not chargeable with any realization that, after going to the tool house and getting whatever information the physical facts afforded, the sheriff would camp there.

The result is, the notion that the railway company, through Fergus, was responsible for the presence of the sheriff at the tool house when Roberts arrived is utterly untenable. Besides that, the railway company, through Fergus, had not released and lost control of any dangerous force or agency when the sheriff passed out of sight going southward, for the operation of which the railway company became responsible. The sheriff was a public officer whose conduct was governed by the law and his own sense of official duty, and under the circumstances narrated there was no perceivable harm which should have urged Fergus to go out to the sheriff, or to call to the sheriff as he passed by, and tell the sheriff Fergus was sending the section foreman to look after the railway company's property.

Indulging for the moment in some speculation, suppose the sheriff, at the tool house, were to see Roberts coming down the tracks from the direction of the depot. Having no advance information that Roberts might likely approach, the sheriff might suspect he was a holdup man. Suppose, further, Fergus were to entertain these suppositions. What would Fergus be required to apprehend concerning such a meeting?

Fergus was not required to apprehend that the sheriff might shoot Roberts because the sheriff was not previously informed regarding possible identity of the person approaching. Such an act would be so extraordinary, so inordinately out of proportion and relation to the assumed cause that no reasonable man would be required to contemplate it. There was no general information which Fergus shared with people at large of tendency of Kansas sheriffs, as a class, to shoot recklessly on sight. The evidence is barren of any special knowledge on Fergus' part that this sheriff had any such propensity. There was nothing to apprise Fergus that the sheriff would be hasty, rash, or erratic. Fergus was entitled to assume that, while the sheriff would not allow a suspected desperado to "get the drop on him," he would act with normal propriety as an officer of

the law, whomever he encountered; and Fergus was not even required to anticipate the sheriff would shoot a recognized robber, unless there was necessity, or apparent necessity, for doing so, created by the robber himself.

Fergus was entitled to assume Roberts would act with reasonable alertness and attentiveness, according to his capacity, which included capacity to see a flashlight held on him in the dark. The mission committed to Roberts was to close the tool house and look after things there, and not to hunt or arrest robbers. Fergus was not required to foresee that Roberts might own a pistol, or might borrow a pistol, and take it with him. When at the depot Roberts did not disclose he had a pistol; and Fergus was not required to anticipate that, if the sheriff found Roberts at the tool house, Roberts would act in a manner that would convince the sheriff it was necessary to kill him.

The shooting occurred in September, 1921. The action was commenced in September, 1923, and the trial occurred in February, 1932. Why trial was postponed so long does not appear. The sheriff testified he shot because he thought he was dealing with robbers. The following question was asked, and answer returned, over objection of defendant:

"Q. If you had been expecting Jess Roberts, and had been informed that he was likely to be there, would you, or not, have likely called his name before you fired the shot? A. Well, I should have asked whether it was Mr. Roberts or not, if I had been told that."

It was proper for the sheriff to tell what his actual mental reaction was to a situation as it existed, or appeared to him to exist. It was not proper for him to leave the realm of the factual, and years after the event undertake to express a speculative opinion regarding what he would have done under hypothetical circumstances. The answer, however, was in the record when the demurrer to the evidence was overruled, and may be considered here.

The answer embraces all the sheriff had to say about what he would have done if he had been expecting Roberts. The sheriff discovered some one was approaching, announced he was sheriff, and commanded a halt. The announcement and command were ineffective. The announcement and command were repeated. When the second command was given, the sheriff turned his flashlight on the man, and saw he was armed with a deadly weapon—a fact not included in information Roberts might be there. The

second announcement and command were ineffective. The announcement was again made, and the command was again given. The weapon was quickly brought to a shooting position, and the sheriff fired the fatal shot. The sheriff's answer does not indicate at what point in this succession of occurrences he would have asked if the man were Roberts, whether at the first opportunity, before announcing and displaying official authority, or some time afterward. No jury could tell what effect a calling on Roberts to speak would have had, and without the sheriff's testimony any conclusion respecting effect of failure to inform the sheriff Roberts might come to the tool house would be the result of guesswork. However deplorable the occurrence may have been, Fergus may not be held responsible for death of a human being, and ten thousand dollars in money may not be taken from one party to the suit and given to another, on "maybe," "perchance," "possibly," or "perhaps." In this instance no affirmation less conjectural can be made.

The result of the foregoing is, it is not only unreasonable to charge Fergus with antecedent realization that the sheriff might inflict bodily harm on Roberts, but causal relation between omission to inform the sheriff Roberts might be in the vicinity of the tool house, and Roberts' death, was not established. Besides that, cause of Roberts' death was established.

Fergus testified he called Roberts because the tool house had been broken into, and he told Roberts the tool house had been broken into. Roberts' daughter, now Mrs. Glenn Koon, testified she was awakened by the ringing of the telephone when Fergus called her father. She arose, went into the room where the telephone was, sat down, and heard the conversation between her father and Fergus, whose voice she recognized. She was letter perfect in her report of the conversation, and here it is:

"The telephone rang, and my father went to the phone, and by that time I was sitting in the chair at the table. Mr. Fergus said, 'Hello, Jess?' and he answered, 'Yes, sir;' 'Your tool house has been broken into, better come down and close it up and attend to things,' and my father said, 'My tool house has been broken into?' and he said 'Yes,' and he said, 'I will be right down, Shorty,' which was his name, the name we always knew him by, Shorty Fergus."

It will be observed robbery was not mentioned. In the conversation between Fergus and Roberts at the depot, breaking into the tool house, and getting out the motor car, were mentioned, but not

robbery. Belman, the night telegraph operator, who heard just what Mrs. Koon heard, testified that, as near as he could remember, Fergus said, "There has been a robbery, and your tool house has been broken into."

The telephone was in the dining room. When the telephone rang, Roberts was in bed and asleep in an adjoining room. The telephone awakened him, and Mrs. Roberts gave the following testimony concerning her husband:

"He was in good health, except that he was a little hard of hearing. . . . His defect in hearing had come on gradually during a period of several years. At the time of his death he could not understand an ordinary conversation unless he was looking at the speaker. . . . If he was working at anything, and not looking at you, he didn't hear you. He couldn't hear ordinary conversations if he was busy or thinking about something, unless he was looking at the speaker."

Roberts equipped himself with a pistol to go to the tool house. He knew the state of the weather. If defective hearing was likely to interfere with ability to conduct himself prudently under the circumstances, nobody knew of the defect better than Roberts. The sheriff's repeated commands were given in a loud voice. Whatever Roberts heard or did not hear, he advanced, without halting, about twelve feet, weapon in hand, against a flashlight which had been turned upon him—a flashlight which disclosed to the sheriff both his hands down by his sides, disclosed the pistol in his right hand, and disclosed his movement. At the last command he did not put up his hands and put them up high. The sheriff saw no movement of his left hand, but Roberts quickly brought his pistol to his hip. The sheriff testified as follows:

"Well, if he hadn't had a weapon, I don't know as I would have fired, but I couldn't say as to that, whether I would or not, but the attitude he raised his hand, showed to me plain that he was going to shoot, and I thought it was about my time."

The jury found specially the sheriff shot Roberts because he saw Roberts armed with a pistol, and the sheriff shot only after he thought his own life was in danger. Since, as indicated, defendant was not guilty of negligence constituting a factor in causing Roberts' death, Roberts was not guilty of mere "contributory" negligence in causing his own death.

The petition pleaded negligence on the part of Fergus in not warning Roberts that the sheriff might be in the vicinity of the tool

house, as well as negligence on the part of Fergus in not informing the sheriff that Roberts might be in the vicinity. As the findings show, the jury based negligence solely on failure of Fergus to inform the sheriff. Under the well-settled rule, the specific finding of one kind of negligence negatived the other.

The duty of the court to submit special questions is absolute. The purpose is to test the integrity of the jury's work. Sometimes, when asked to state of what negligence the defendant was guilty, a jury will even specify supposed negligence neither pleaded nor proved. In the case of *Adams v. Railway Co.*, 93 Kan. 475, 144 Pac. 999, the opinion reads:

"The defendant had the right to know from the jury itself the fault or faults attributed to it, if it were found to be at fault. [Citations.] The question, 'What negligence was the defendant guilty of towards said plaintiff that caused the accident?' was intended to elicit a full statement of the facts constituting the defendant's negligence. [Citation.] The question was plain and simple, related to the ultimate and vital issue in the case, and a jury that could not understand it would scarcely be competent to render a general verdict pronouncing upon the rights of the parties." (p. 481.)

So the court has consistently and repeatedly held a specific finding of negligence is in effect a finding negativing existence of any other form of negligence, and a declaration by the jury that the general verdict is not based on any other form of negligence. The latest announcement of adherence to the rule appears in the case of *Brim v. Atchison, T. & S. F. Rly. Co.*, 136 Kan. 159, 12 P. 2d 715, decided in July, 1932.

In this instance, there was a dispute in the testimony whether before leaving the depot for the tool house Roberts had information that the sheriff might be in the vicinity of the tool house. Fergus testified he gave Roberts such information. There was testimony indicating such information was not given, and the first finding of fact settled that dispute. Plaintiff contends the finding did much more. Plaintiff contends that besides finding Roberts did not have information the sheriff might be at the tool house, the finding established negligence on the part of Fergus, and established that the negligence constituted cause of the injury of Roberts. In support of this contention plaintiff cites the case of *Springer v. Railroad Co.*, 95 Kan. 408, 148 Pac. 611.

The Springer case involved an accident at a street crossing of a railway track. The caboose of a backing train collided with the

automobile Springer was driving, and he was killed. Three grounds of negligence were alleged: no flagman at the crossing, insufficient lights on the caboose, and failure of the rear brakeman to stop the train after discovering the automobile was in peril. There were special findings establishing contributory negligence of the driver of the automobile. The jury found specially there were four lights on the caboose, and returned the following special findings:

"9. Did not the brakeman on the hind end of the car apply the air brakes as soon as he discovered that there was danger of the automobile and train colliding? A. No.

"13. What negligence, if any, do you find the defendant, the Chicago Great Western Railroad Company, guilty of? A. By not complying with city ordinance in not having a flagman."

A general verdict for plaintiff, based on the ground there was no watchman at the crossing, could not stand because of the contributory negligence of the driver of the automobile. But there stood the special finding of fact, based on evidence disclosing a typical case for application of the last-clear-chance doctrine, that if the brakeman had used the air brakes promptly, the fatality would not have occurred. In the opinion the court said:

"The principal negligence charged in the petition and referred to in the instructions was the delay in stopping the train after the brakeman became aware of the peril to which the occupants of the automobile were exposed. In view of this fact the answer to the question just quoted must be regarded as a finding that the company was negligent in not stopping the train sooner, and the subsequent statement that the negligence of the defendant consisted in not providing a flagman must be interpreted as designating the additional respect in which it was negligent. This construction is in accordance with the practice of giving to the findings of a jury the meaning intended, however unskillfully expressed." (*Springer v. Railroad Co.*, 95 Kan. 408, 409, 148 Pac. 611.)

The reason given for the decision was not convincing. There was no indication the jury meant other than what it said, or was unskillful in expressing its meaning. The previous uniform decisions of the court were not cited or discussed; and there was no attempt to harmonize the decision with the earlier cases. The conduct of the brakeman, however, was so flagrantly culpable that, with a fact clearly establishing liability duly found by the jury, judgment for defendant on the special findings would have been unreasonable and unjust. So the rule theretofore prevailing relating to treatment of special findings was modified, and the following rule was announced in the syllabus:

"Where the jury in a personal-injury case are asked to state in what respect the defendant was negligent, and in answer refer only to a single matter, this does not preclude another form of negligence, the existence of which they had already specifically found, being relied upon to support a verdict for the plaintiff." (¶ 1.)

In the case of *Moler v. Railway Co.*, 101 Kan. 280, 166 Pac. 488, the court deemed it proper to state what amounted to a qualification of the rule announced in the syllabus of the Springer case. The Moler case was a crossing case. The jury found specially the automatic crossing bell was not ringing. When asked on what acts of negligence the verdict was based, the jury omitted to mention the crossing bell, and said the train was operated at an excessive rate of speed, and signals were not given after the fireman saw the plaintiff. Notwithstanding the fact a ground of negligence specially found by the jury appeared, judgment for plaintiff was reversed, and judgment was ordered for the railway company. Concerning the negligence in respect to the crossing bell, the opinion said:

"The jury also found that the crossing bell—an automatic electric gong—was not ringing. If the failure to keep that device in working order *had necessarily constituted negligence* (italics for elucidation), the finding as to the negligence relied upon could be interpreted as an enumeration of the grounds of negligence additional thereto. (*Springer v. Railroad Co.*, 95 Kan. 408, 148 Pac. 611.) But the question whether such failure was negligence was one of the issues of fact submitted to the jury, and their omission to include it in their enumeration of negligent acts relied upon shows that they did not consider the company in fault with respect thereto. (*Adams v. Railway Co.*, 93 Kan. 475, 144 Pac. 999.)" (p. 281.)

The result, stated in simplified form, is that when two grounds of negligence are pleaded, proved, and specially found, but in answer to a request to tell in what the negligence of defendant consisted, the jury specifies only one ground, the other is in effect negatived, unless the finding of the other in itself necessarily establishes negligence causing the injury.

The decision in the Springer case has been referred to in several subsequent cases, without also referring to the Moler case. Sometimes the form of the question calling for enumeration of negligent acts or omissions may be such that there is no room for interpretation, and the omitted act or omission is excluded from consideration (*Case v. Yoakum*, 99 Kan. 253, 161 Pac. 642). Sometimes it is manifest the omitted ground was not considered by the jury to be important (*Land v. Railroad Co.*, 95 Kan. 441, 445, 148 Pac.

612). Sometimes the finding of the omitted ground is an express finding of negligence (*Dye v. Railroad Co.*, 101 Kan. 666, 669, 168 Pac. 1087). In other cases particularization by the jury has been regarded as an attempt to state a ground or grounds additional to those already specifically found (*Brown v. Railway Co.*, 104 Kan. 505, 180 Pac. 211; *Brown v. Utilities Co.*, 110 Kan. 283, 203 Pac. 907). In the decisions holding an item omitted from the enumeration might be considered, the omitted item was of the same class and grade as the item or items contained in the enumeration.

The unanimous opinions in the Springer and Moler cases were both formulated by Mr. Justice Mason. The court regards the limitation placed on the decision in the Springer case by the decision in the Moler case as sound. Otherwise the benefit of the statute authorizing special findings and providing special findings shall control the general verdict (R. S. 60-2918), would be frittered away.

In this instance, the action was predicated on breach of duty of an employer to provide his employee with a safe place in which to work, and if danger not obvious to the employee existed, to give him proper warning. The court gave general instructions relating to this duty. When, however, the court undertook to apply the general instructions to the particular facts of the case, the court departed from the evidence:

"So, if you find that Jess E. Roberts was acting within the scope of his employment at the time of his death, and further find from the preponderance of the evidence that the defendant's agents and employees also called the sheriff of this county and requested him to go to the same tool house and watch for thieves and robbers, then you are instructed that it would be the duty of the defendant to warn Jess E. Roberts that the sheriff was to be there, and it would also be the duty of the defendant to warn the sheriff that Jess E. Roberts had also been called to come to the said tool house."

There was no evidence that Fergus, or anybody else, requested the sheriff to go to the tool house, or any place else, to watch for thieves or robbers, and it was not possible for the jury to find the condition stated by the court giving rise to duty to warn either Roberts or the sheriff.

The simple fact that Roberts did not have information the sheriff was looking for the robbers did not of itself establish negligence of defendant causing the injury. At most it was merely a fact to be considered in determining whether due care had been used and in determining cause of the homicide. If the verdict had been for de-

fendant, it could not have been set aside on account of the first finding, and there was abundant reason for the jury preferring to rest liability on the fifth and sixth findings. If the situs of the tool house was made unsafe for Roberts, it was made so by the presence of the sheriff. The sheriff was the dangerous agency, and the jury might well believe it was sufficient to warn the sheriff Roberts would be there. Besides that, the jury might well believe previous warning to Roberts the sheriff might be there could not, under all the circumstances, have been more effectual when Roberts was confronted by somebody than were the repeated warnings the sheriff did give of his presence. In any event, failure to inform Roberts the sheriff might be at the tool house did not necessarily constitute negligence on the part of the railway company causing the injury, and the verdict rests on the fifth and sixth findings of fact.

At the trial plaintiff produced the sheriff as a witness, and examined him concerning what occurred up to the time he waved to Fergus as he was going southward toward the tool house. The court then permitted plaintiff to prove the homicide by introducing in evidence portions of the opening statement to the jury of counsel for defendant. The opening statement expressed what counsel understood the testimony would be, and bore no resemblance to an admission dispensing with proof. Counsel for plaintiff seemed to have understood proof was essential, but instead of producing proof they merely offered a narrative of what the proof would be. The action of the court in sanctioning such procedure constituted egregious error. (See *State v. Thomas*, 136 Kan. 400, 15 P. 2d 723.)

Defendant offered the sheriff as a witness, and the special findings show his testimony was accepted and relied on by the jury.

The transcript of the proceedings at the trial discloses that at the close of plaintiff's evidence defendant demurred to the evidence on the ground no case had been established against defendant and the demurrer was overruled. The transcript also discloses that at the close of all the evidence defendant again interposed a general demurrer to the evidence and the demurrer was overruled. Plaintiff makes the technical objection that no demurrer to evidence was "filed" pursuant to the third subdivision of R. S. 60-2909, relating to order of procedure. If technicality were to prevail, it might be said the subdivision applied only to the first demurrer, which is not insisted on here. However, it may be conceded that filing implies

a writing to be filed. The purpose of the statute is to insure definiteness and certainty in the record of the proceedings. The statute, however, is directory only, and in this instance the full purpose was accomplished by entering both demurrers and the rulings respecting them on the permanent record, the journal of the court.

Fully conscious of the limitation upon its authority in cases of this character, but also fully conscious of its duty, the court holds liability of defendant to plaintiff was not established, and the demurrer to the evidence interposed at the close of all the evidence should have been sustained.

The judgment of the district court is reversed, and the cause is remanded with direction to enter judgment for defendant.

HARVEY, J., dissenting.

THIELE, J., not participating.