## No. 31,100

CHARLES E. LEINBACH, *Appellee*, v. THE PICKWICK-GREYHOUND LINES and ORVILLE L. THOMPSON, *Appellants*.

(23 P. 2d 449.)

Opinion filed July 8, 1933.

J. E. McFadden, O. Q. Claflin, Jr., both of Kansas City, M. J. Healy, of Topeka, Edmund H. McVey, C. A. Randolph and Alfred Kuraner, all of Kansas City, Mo., for the appellants.

Fred Robertson, Edward M. Boddington and J. O. Emerson, all of Kansas City, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one for damages sustained by Charles E. Leinbach when the automobile in which he was riding was struck by a bus operated by defendant Pickwick-Greyhound Lines, an interstate transportation corporation. The driver of the bus, Orville Thompson, was made a party defendant. The jury returned special findings of fact and a general verdict in favor of plaintiff. Judgment was entered accordingly, and defendants appeal.

This is a second appeal. At the first trial the verdict and judgment were for plaintiff. On appeal the judgment was reversed, and the cause was remanded for new trial. (Leinbach v. Pickwick Greyhound Lines, 135 Kan. 40, 10 P. 2d 33.) In order that this opinion may be complete in itself, it is necessary to make a statement of the facts of the accident. For brevity the defendant Orville Thompson will be referred to by name or as the bus driver, and Pickwick-Greyhound Lines will be referred to as the defendant.

Seventh street and Lyons avenue in North Lawrence intersect. From the intersection Seventh street extends north and south. Lyons avenue extends east and west. The center of Seventh street is paved with an eighteen-foot concrete slab and is a part of highway U. S. 40. Adjoining the pavement on the east was a dirt shoulder five to seven feet wide. East of the shoulder was a shallow ditch with gently sloping sides. East of the drain and level with the shoulder and the pavement was a field, vacant and uninclosed. The pavement, shoulder and drain were dry. Lyons avenue is an unpaved street forty-five feet wide. The traveled way is eighteen feet wide, is south of the center of the street, and extends to within six feet of the south line of the street. West of U. S. 40 and north of Lyons avenue was Claude Minor's house. The house stood on an elevation, and the house, a fence and some trees obstructed the view of a driver of an automobile approaching the intersection from the north or from the west until near the intersection. West of U. S. 40

and south of Lyons avenue were obstructions to the view of an automobile driver approaching the intersection from the west until near the intersection. South of Lyons avenue is Lincoln street. The distance from the north line of Lincoln street to the center of Lyons avenue is 624 feet, and for that distance the pavement is practically level.

W. E. Stickel, driving a Dodge sedan, approached the intersection from the north on the west side of the pavement. With him in the front seat was Charles Leinbach, the plaintiff. In the rear seat were Mrs. Stickel and Mrs. Leinbach. As the Dodge car approached the intersection from the north, a Ford roadster, driven by Bernard Riewe, approached the intersection from the west on the traveled portion of Lyons avenue. In the seat with the driver of the Ford were Carl Wheeler and Mrs. Laverne McManus. The Dodge and the Ford collided. Just before the collision the Dodge was turned toward the center of the pavement. The Ford kept its course eastward and struck the Dodge when the Dodge was about the center of U. S. 40 and in the south portion of the intersection. The right rear fender of the Dodge and the right running board, just in front of the right rear wheel, were smashed. The left front fender and headlight of the Ford were smashed, and the left front wheel of the Ford was broken.

There were various estimates of the speed of the two cars as they approached the intersection and at the time of the collision. For the Dodge the estimates ranged from twenty to forty miles per hour, and for the Ford from fifteen to forty miles per hour. The two cars "whirled around." They "spun around." It took them "just an instant" to get over to the east side of the pavement.

The Dodge turned until the front end was toward the north. The Ford followed the Dodge around until it was east of the Dodge with its front end toward the southeast. The Dodge was on the pavement and the Ford was on the shoulder close beside the Dodge. The Ford finally turned over on its side. Riewe, testifying for defendant, said the front part of the Ford was in the ditch. None of the occupants of the Ford was severely injured.

While the events described were in progress, defendant's bus was approaching the intersection from the south on the east side of the pavement. The bus was about thirty feet long and seven feet six inches wide, and there were twelve passengers in the bus. The bus

had four speeds forward. The driver said that at the corner of Lincoln street the bus was in second gear. He said that about half way between Lincoln street and Lyons avenue he shifted to third speed. As indicated above that would be about 300 feet from the center of Lyons avenue. The driver said that after he shifted gears and straightened up, he saw confusion ahead. He said he did not see the collision between the Ford and the Dodge. He said the first he saw of the Dodge the front end of it was facing toward the northwest. The rear end was practically toward the southeast and was turning toward him. It continued to turn until the back of the Dodge was directly toward him. He said he did not see any portion of the side of the Dodge. He first saw the back end of it. He said that when the Dodge got with its back directly toward him, the car was in the act of turning over off its wheels. He said two wheels on one side were lifted off the pavement and the other two wheels front and back were on the pavement. He said the Dodge seemed to be turning over on two wheels and seemed to be practically leaving the pavement. He would not say whether the two wheels were off the pavement three to four inches or two to three feet.

The bus struck the rear end of the Dodge. The observation of passengers in the bus and of others was that the Dodge had not risen from the pavement but was still on its wheels when the bus struck it. A witness for defendant said the Dodge was still in the air, and Orville Thompson said the Dodge had not turned over on its side when the bus hit it.

The bus propelled the Dodge forward about six or eight feet and turned it over on its back with its wheels in the air. Witnesses testified there was not much length left of the Dodge, it was sort of in a ball; was pushed up into a sort of ball. The springs were buckled upward. The occupants of the front seat were crushed against the instrument board, and the occupants of the back seat were crushed against the front seat. Mrs. Leinbach and Mrs. Stickel were killed outright. Mr. Stickel was extricated with difficulty from under the steering wheel and died a few hours later. The body of Mrs. Leinbach was removed from the wreck, but the body of Mrs. Stickel could not be extricated. The Ford took fire. The fire was communicated to the Dodge, and Mrs. Stickel's body was charred. Mr. Leinbach was rendered unconscious for a period of thirty-six to forty-eight hours and was intermittently unconscious for a longer period. His right ankle was dislocated, his left knee

cap was pushed to one side of the leg, the head of the left femur was forced upward and forward out of its socket, and the socket rim was broken. The twelfth dorsal and fifth lumbar vertebræ were fractured. He suffered a brain lesion, which has destroyed the sense' of taste on one side of the tongue, and he suffered other injuries.

Plaintiff's petition pleaded negligence in operation of the bus with respect to speed and failure to reduce speed; violation of city ordinances relating to speed and operation of the bus; failure to turn the bus to the right; and, in effect, that Thompson negligently failed to improve opportunity to avert the accident after plaintiff was in a perilous situation from which he could not extricate himself. The joint answer of defendant and Thompson denied they were negligent. The answer also pleaded the accident was caused by negligence of Stickel, acting for plaintiff, and of Riewe. The answer also pleaded contributory negligence of plaintiff generally, and pleaded violation of the city ordinances by plaintiff.

The testimony regarding the manner in which the accident occurred was conflicting, and the testimony regarding matters now to be considered was conflicting. For the benefit of counsel from a neighboring state, who conducted the defense and who argued the case here, some rules of appellate practice in this state must be stated. This court is not now concerned with the credibility of witnesses. At the trial the witnesses were tested in all possible ways. Various forms of impeachment were employed, and what the jury was warranted in believing was a matter for the jury to determine, subject to approval by the trial court on motion for new trial. This court is not now concerned with conflicts in the evidence. Those were matters to be resolved by the jury, subject to approval by the trial court. This court is not now concerned with the evidence favorable to the defense or with inferences from evidence favorable to the defense. The general verdict of the jury and the special findings of fact are regarded as supported by whatever substantial evidence there may be favorable to plaintiff and by the reasonable inferences which may be derived from that evidence. These rules are fundamental in considering a case on appeal. They are ignored in the brief for the defense, and, consequently, the court cannot follow the brief in its presentation and argument of the case.

The following facts were found by the jury:

"1. At what speed was the bus going at the time the driver thereof first saw that the Dodge was in or coming into a position of imminent peril of being struck by said bus? A. Twenty-five miles.

"2. At the speed given by you in your answer to the preceding question, state within what distance the bus driver could have brought said bus to a stop after he saw the Dodge sedan in or coming into a position of imminent danger of being struck by the bus. A. Thirty-six feet.

"3. At the time the driver of the bus first saw the Dodge in or coming into a position of imminent danger of being struck by the bus, where was the south end of the Dodge with relation to the south line of Lyons avenue? A. Ten to twelve feet.

"4. At the time the bus driver first saw the Dodge in or coming into a position of imminent peril of being struck by the bus, how far was the front end of the bus from the south line of Lyons avenue? A. Seventy-five feet.

"5. How far south of the south line of Lyons avenue was the rear end of the Dodge sedan when the bus and Dodge sedan collided? A. Ten to twelve feet.

"6. At the moment of collision between the Ford roadster and the Dodge sedan were a model T Ford, a Hudson car driven by Mrs. Petty, a model A Ford car driven by J. M. Evans, and a car driven by M. L. Dicker in the first block north of Lyons avenue and being driven south on the west side of highway No. 40 back of the Dodge sedan? A. Yes.

"7. Did the Dodge, before the collision with the bus, turn over on its side or top as a result of the collision with the Ford? A. No, in act of turning.

"8. Where was the Ford car that collided with the Dodge in relation to the dirt shoulder and ditch east of the slab immediately before the collision between the bus and the Dodge? A. On the shoulder east of pavement in contact with Dodge, partially in ditch.

"9. Did the driver of the bus use every appliance at hand that he could use in his bus to avert the collision with the Dodge sedan at the time he first saw the Dodge sedan in or coming into a position of imminent peril of being struck by the bus? A. No.

"10. If you answer the preceding question 'No,' then state with particularity what the bus driver omitted to do. A. Used all brakes but did not turn off slab soon enough.

"11. What injuries, if any, did the plaintiff or his wife sustain in the collision between the Dodge and the Ford? A. None."

It is contended by the defense that finding No. 2—that after seeing the Dodge in peril the bus driver could have stopped the bus in thirty-six feet—was not sustained by evidence. The bus was equipped with four-wheel Westinghouse air brakes operated by foot pedal and with an emergency brake operated by a lever at the left of the driver. The air brake commenced to operate instantly as the pedal was pressed and operated to its full braking power when the pedal was fully pressed down. The brakes were designed to be adequate for the control of the bus and were in proper condition at the time of the accident. There was testimony by an experienced driver of buses of the type herein involved that this bus, loaded with seven

or eight passengers and traveling on a flat concrete pavement at a rate of twenty-five miles per hour, could be stopped in twenty or twenty-five feet. Another experienced driver testified that under the same conditions a stop could be made in from seventeen to twenty feet. An expert witness for the defense said the stopping distance of this bus going at the rate of twenty-five miles per hour was thirty-one feet. Orville Thompson said thirty to thirty-five feet.

In its answer to the third question, the jury did not specify whether the south end of the Dodge was north or south of the south line of Lyons avenue when the bus driver saw the position of the Dodge. The brief for the defense contends the finding was that the south end of the Dodge was north of the south line of Lyons avenue. The brief ignores the testimony of Orville Thompson, who said all of the Dodge seemed to be south of the intersection and when he saw the Dodge he saw the Ford to the south of the south edge of Lyons avenue, close to the Dodge, and neither north nor south of the Dodge.

In the brief for the defense it is contended finding No. 4, that when Thompson first saw the Dodge the front end of the bus was seventy-five feet from the south line of Lyons avenue, is not sustained by evidence. The contention is wholly without merit. The fifth finding of fact, that when the bus struck the Dodge the south end of the Dodge was ten or twelve feet south of the south line of Lyons avenue, is not contested, and it may be said here the first five special findings of the jury established negligence, on the part of the bus driver, which caused the accident.

An auto vehicle moving at the rate of twenty-five miles per hour travels $36\frac{2}{3}$ feet in a second of time, or, for practical purposes, 37 feet per second. A witness for defendant testified that after observing occasion for an emergency stop a driver's reaction time for application of brakes is one-half second. The bus was seventy-five feet from the south line of Lyons avenue when need for an emergency stop was observed. The south end of the Dodge was ten or twelve feet south of the line, leaving sixty-five or sixty-three feet in which to stop. Deducting distance covered by the bus during the driver's reaction time, 18.5 feet, the driver had 46.5 or 44.5 feet in which to stop. He could have stopped within thirty-six feet, with the front end of the bus eight or ten feet south of the Dodge.

The reaction time which has been referred to is average reaction

time of drivers generally, including the quick and the slow. Individuals may not conform to type. Orville Thompson testified he applied his brakes "instantly" and, after consideration of the subject on the witness stand, his judgment was that after seeing the Dodge he went about four or five feet before he applied his brakes. Deducting distance traveled by the bus during this driver's reaction time as estimated by himself, he had fifty-eight or sixty feet in which to stop. He could have stopped within thirty-six feet, with the front end of the bus twenty-two or twenty-four feet south of the Dodge. He did not do so, and the gruesome consequences which have been described followed.

The sixth finding of fact was correct. It was important only as bearing on the question whether the bus driver might have turned to the left, and for present purposes that subject need not be considered. The seventh finding of fact, that the Dodge did not turn over on its side or top as a result of the collision with the Ford. and before collision with the bus, was well sustained by evidence.

The position of the Ford immediately before the bus struck the Dodge, as described in the eighth finding, is not contested. In this connection it may be noted that the Dodge was not at any time off the pavement. It was in or at the center of the pavement when the Ford struck it. Its own momentum carried it toward the south. The force of the blow delivered by the Ford spun it around until it faced the direction from which it came, on the east side of the pavement. The result is that immediately after the Ford blow was delivered, the Dodge was in front of the bus—was in imminent peril of being struck by the bus.

It is contended the ninth finding, that the bus driver did not use all his appliances at the time he first saw the Dodge in peril, was not sustained by evidence. Without discussing the subject generally, the finding was sustained by evidence relating to the time which elapsed between the crash when the Ford struck the Dodge and the louder crash when the bus struck the Dodge. Estimates of witnesses ranged from simultaneousness to six or seven seconds. There was concrete evidence on the subject. Mrs. Minor, who lived in the house on the northwest corner of the intersection of U. S. 40 and Lyons avenue, was in her dining room when she heard the crash of the collision between the Ford and the Dodge. She was on the south side of her dining room table and had just picked up some dishes to take to the kitchen sink twenty feet away. She

walked hurriedly to the sink, and just as she put the dishes in the sink she heard the second crash. She then rushed outdoors to see what had happened. Orville Thompson testified he was only fifteen or twenty feet away when he first saw the confusion ahead of him and that the bus moved about nineteen feet after he applied his brakes, which included four feet after striking the Dodge. Without making any allowance for Mrs. Minor's reaction time, the distance she moved in the interval between the two crashes was such that Thompson's testimony concerning distance from the Dodge when he first saw it was disregarded as utterly absurd (finding No. 4); but his testimony concerning distance the bus moved after he applied his brakes was confirmatory of other testimony indicating he applied his brakes when about the length of the bus from the Dodge.

The tenth question requested particularization respecting what the bus driver omitted to do in the event he did not use all his appliances when he first saw the Dodge in peril. The answer was he used all brakes, but did not turn off the slab soon enough. It is contended the answer nullified previous findings that the bus driver could have stopped but did not, and exonerated him from all negligence except failing to turn to the right soon enough.

Another rule of appellate procedure must here be called to the attention of counsel for the defense. It is not the business of this court to be astute to discover conflicts between special findings, or conflicts between special findings and general verdict. It is the duty of the court to read special findings together, and to interpret them in such a way they may be harmonized, when that can be done. Likewise it is the duty of the court to harmonize special findings with the general verdict, when that can be done. Construed as indicated, there is no conflict between the special findings.

The first five findings established speed of the bus, distance within which it could be stopped, location of the Dodge before and at the time of collision, and distance of the bus from the Dodge when the driver saw the Dodge. The collision was a conceded physical fact. It would have been prevented if the bus driver had stopped within 36 feet, as he could have done. Consequently the tenth finding is to be read with the other findings, so that the full meaning is this: The driver used all brakes, but did not turn off the slab soon enough; but he did not use the brakes so that collision was prevented. This method of interpretation is quite analogous to the method employed

when several grounds of negligence are found, and the jury then specifies a particular ground on which the verdict rests. That subject was considered at length in *Roberts v. St. Louis & S. F. Rly. Co.,* 136 Kan. 749, 18 P. 2d 167. In the opinion the decisions of this court were reviewed, and it was said:

"The result, stated in simplified form, is that when two grounds of negligence are pleaded, proved, and specially found, but in answer to a request to tell in what the negligence of defendant consisted, the jury specifies only one ground, the other is in effect negatived, *unless the finding of the other in itself necessarily establishes negligence causing the injury."* (p. 761.)

In this instance the first five findings necessarily established negligence causing the collision.

At the first trial the jury was more meticulous in expressing its meaning. The ninth and tenth findings read:

"9. Did the driver of the bus use every appliance and means at hand that he could use, with safety to the passengers in said bus, to avert the collision with the Dodge sedan, after he saw the Dodge sedan in a position of danger? A. No.

"10. If you answer the preceding question No. 9 'No,' then state, with particularity, what he omitted to do. A. He failed to apply his brakes in time to avoid the collision, nor did he turn out to the right in time." (*Leinbach v. Pickwick Greyhound Lines,* 135 Kan. 40, 44, 10 P. 2d 33.)

Orville Thompson testified that when he saw the Dodge in peril he turned to the right. When the bus stopped its right front wheel was on the shoulder a foot and a half or two feet from the pavement. The right rear pair of wheels was near the edge of the pavement, perhaps just off the pavement. When the Ford took fire, the bus was pushed backward, and the precise location of the wheels of the bus when it stopped was not surely established. It is contended that if the bus driver had turned to the right in time to avoid striking the Dodge, he would have struck the Ford; that it was not possible to turn the bus far enough to the right to clear both cars and keep the bus upright; and that presence of the ditch made it foolhardy to turn off the shoulder. The court will not extend this opinion by a detailed discussion of the contentions stated and other related contentions, which present nothing but questions of fact. Whether under the circumstances it was feasible and practicable to avoid a collision by turning to the right was a clear question for the jury, and two juries have concurred in finding specifically the driver did not turn soon enough.

In connection with the subject of turning to the right, confusion of the bus driver in the emergency is exploited in the brief for the defense. There was no evidence that the bus driver was confused. He used the word confusion, but he used it to describe what was occurring in front of him after the Ford struck the Dodge. His own recital of what he saw and what he did excluded perturbation or bewilderment on his part. However, the court gave the jury an instruction relating to conduct in an emergency, and the bus driver had the benefit of the distinction between negligence and making a wrong choice in a crisis.

Orville Thompson testified concerning the various factors to be taken into account in making an emergency stop. One of them was safety to passengers. Defendant offered some evidence which was admitted and was then stricken out, requested two special findings which were not submitted, and requested an instruction to the jury which was not given, bearing on the subject. Defendant stresses the high duty of a carrier of passengers for hire to its own passengers, and assigns the rulings as error.

The testimony which was admitted and stricken out was to the effect that, taking into consideration the safety of passengers, a driver cannot stop as quickly as if the bus were empty, and the greater the speed the less safety in making a sudden stop. The following question was asked:

"Assuming you are going 25 miles an hour and want to take into consideration the element of safety to your passengers in making an emergency stop, in what distance would it take you to bring it to a stop?"

The court held this necessarily opened a field for idle speculation: Going at twenty-five miles per hour, how quickly could the bus be stopped with safety to passengers when about to collide with a bigger and heavier bus filled with passengers? Going at twenty-five miles per hour, how quickly could the bus be stopped with safety to passengers when about to run down an automobile, kill two or three persons, and more or less certainly injure passengers in the bus? Other problems readily suggest themselves. Therefore, the inquiry was properly halted with testimony not stricken out that safety to passengers is a factor to be considered when making an emergency stop, along with speed, kind of road, distance within which to make a stop, which way to turn, etc.

Due care to passengers was merely a circumstance, like any other

condition under which the event took place, and the jury was correctly and adequately instructed concerning taking into account all circumstances bearing on propriety of the bus driver's conduct. There was no occasion to single out safety of passengers so that it might perform the function of a herring drawn across the trail to duty of the bus driver to occupants of the Dodge car threatened with horrible death. Besides this, the subject became of small consequence in view of Orville Thompson's testimony that in this instance he acted without regard to the safety of his passengers. He said he put on all his air and used the emergency brake for an emergency stop. His recollection was passengers were moved forward in their seats but were not thrown out of their seats. There was evidence of some undescribed injury to one passenger, whether from application of the brakes or from collision with the Dodge was not disclosed. But the evidence and findings disclosed a situation in which a stop might have been made with safety to everybody.

Numerous other errors are assigned with respect to conduct of the proceedings before submission of the case to the jury. Some are trivial, and some are conjectural. Some may not be considered. Thus, evidence offered and rejected was not produced at the hearing on motion for new trial. Others might be made the subject of discussion in an opinion if it were necessary, but it is not necessary. After careful consideration of the proceedings, the court is satisfied nothing occurred at the trial which influenced the jury in returning answers to the questions which were propounded, or which led to incorrect answers. When set to the task of stating facts, the jury canvassed the evidence and reached their conclusions from the evidence. Their conclusions, including the eleventh finding that plaintiff and his wife sustained no injuries in the first collision, were supported by evidence, and, facts establishing liability having been well found, little else matters.

The drivers of both automobiles were negligent, and the doctrine of last clear chance was involved in the case. Because the defendant contends an instruction given to the jury was contrary to the law of the case stated in the former opinion, it is necessary to discuss the contention to prevent future misunderstanding regarding an important subject.

When the court instructed the jury, the court could not know what view the jury would take of the evidence or what the findings would be, and it was necessary to instruct the jury accordingly. Thompson

had testified he did not see the collision between the Ford and the Dodge. He said that as he approached the intersection he saw cars coming from the north on their own side of the pavement. He said he then glanced to the east and saw a truck coming from the east on Lyons avenue and within twenty or thirty feet of the pavement. It was slowing down, practically stopping, and he gave no further attention to it. When he turned his eyes to the road again the collision between the Ford and Dodge had occurred, and the first thing he saw was the back end of the Dodge in front of him. The jury might or might not believe this testimony. The truck driver testified he stopped thirty feet east of the pavement. Before he stopped he saw the Ford coming from the west, and while he was standing there the Ford came from the west and collided with the Dodge coming from the north. Thompson did not pretend he looked toward the west at any time, and the question arose whether he should have done so. Accepting as true Thompson's testimony he did not, in fact, see the first collision, the question obtruded whether, in the exercise of reasonable care, he ought to have seen the Ford and the Dodge before he was confronted with the rear end of the Dodge on the east side of the pavement. Thompson testified he first saw the Dodge when the front end of the bus was only fifteen or twenty feet from the nearest point of the Dodge. If he was telling the truth, the question arose whether he ought to have seen the Dodge sooner. Other questions raised by the evidence were whether plaintiff's negligence ceased before collision with the bus, and if so, when; whether the occupants of the Dodge were in a condition of helpless peril when the bus struck the Dodge, and if so, when the condition was first manifested.

For present purposes it is sufficient to present a single instruction. The court told the jury, in substance and in effect, that if a plaintiff is guilty of negligence which was concurrent with defendant's negligence and coöperated to produce the injurious result, the plaintiff cannot recover; but, if a plaintiff through his own negligence places himself in a position of peril from which he cannot extricate himself, he may recover if defendant saw, or by the exercise of reasonable care should have seen, plaintiff's situation in time to avoid injuring him.

Defendant contends it would be liable only if Thompson actually saw plaintiff in a position of peril from which he could not extricate himself in time to prevent the collision. In other words, if Thomp-

son were watching a scrub ball game out in the field east of the highway until too late to avoid crashing into the Dodge, he would be excused because he did not actually see the Dodge sooner. That is not the law of this state.

In an excellent book just off the press, A Treatise on the Law of Torts, by Fowler Vincent Harper, professor of law in Indiana University (Bobbs-Merrill Company, Indianapolis, 1933), the origin and development of the doctrine of last clear chance in England, adoption and development of the doctrine in the United States, and the present status of the doctrine, are presented. Concerning the subject under consideration it is said:

"But a majority of jurisdictions allow a wider scope to the principle of last clear chance and hold the defendant to the duty of ascertaining the plaintiff's perilous predicament, if, in the exercise of reasonable care, it would have been discovered and if the relation of the parties is such that the defendant owes to the plaintiff the duty of reasonable vigilance. Under this rule a plaintiff who has negligently exposed himself to a danger from which he is unable, at the time of the accident, to extricate himself, may hold a defendant who, as a reasonable man, should have discovered the plaintiff's danger at any time after the situation had got beyond the plaintiff's power to save himself and if such discovery would have enabled the defendant, by the exercise of reasonable care, to avoid the accident." (p. 305, § 138.)

It will be observed defendant is not liable to plaintiff in helpless peril for what defendant should have discovered unless defendant owed to plaintiff the duty to be vigilant. This does not mean the duty must be owed to plaintiff as an individual and alone. It is sufficient that the duty of vigilance be to a class of persons of which plaintiff is a member. In this instance the collision occurred at a city street crossing used by automobiles approaching from east, west, north and south, and defendant rested under duty of vigilance to avoid injury to all highway users at that point, including plaintiff.

Concerning the subject of concurring negligence, embraced in the first part of the court's instruction, Professor Harper says:

"The soundness of the principles under consideration obviously rests upon the fact that the plaintiff has, for some reason or other, allowed the perilous situation to get beyond his control. By his own negligence he has allowed his person or property to be exposed to danger, and he is now, in a sense, at the mercy of others. The law still holds others to the duty of acting with care, under the circumstances—the 'circumstances' now including the plaintiff's peril. It follows, thus, that the doctrine of last clear chance does not include cases in which a plaintiff has the physical and mental ability to avoid the risk up to the moment of harm. His 'continuing' negligence, as it is sometimes

called, continues to insulate the defendant's negligence, and the ordinary rule of contributory negligence governs the case." (p. 306, § 139.)

In this state the subject of what defendant in the exercise of reasonable care should have discovered, as distinguished from what he actually saw, first appeared in the opinion in the case of *Railway Co. v. Arnold*, 67 Kan. 260, 72 Pac. 857 (1903). The case involved collision between a street car and a bicycle rider who fell in front of the street car at a street crossing. The man held to the car fender and was carried 75 feet before he fell under the wheels and was killed. The petition contained the following allegation:

" 'The defendant was guilty of further negligence in this, to wit: That the motorman in charge of said car which struck said James Arnold, deceased, saw, or by the use of reasonable diligence would have seen, said deceased, James Arnold, in a dangerous position, and said motorman, after seeing or by the use of reasonable diligence would have seen said James Arnold in said dangerous position, had sufficient time to have stopped said car and thus avoided the accident and saved the life of said Arnold.' " (p. 268.)

This ground of negligence was presented to the jury by an instruction, and judgment for plaintiff was affirmed by this court. A vigorous petition for rehearing, raising the precise point the defendant raises in this case, was denied.

In the Arnold case what the motorman should have discovered was the bicycle rider's dangerous position *from which he could not extricate himself*. Helplessness to save himself was not specifically pleaded nor referred to in the opinion of this court, and without consideration of the facts upon which the decision was based it might be regarded as applying to cases of continuing negligence. In the case of *Dyerson v. Railroad Co.*, 74 Kan. 528, 87 Pac. 680 (1906), this subject was considered, and after stating the facts of the Arnold case the court said:

"A judgment against the street-car company was upheld only upon the theory that after he [the bicycle rider] had reached a position of danger from which he could not extricate himself—that is, after his negligence had ceased— the defendant's employees were negligent in failing to discover his peril and stop the car." (p. 538.)

In the opinion in the Dyerson case the subject of concurrent negligence was expounded as follows:

"The test is, What wrongful conduct occasioning an injury was in operation at the very moment it occurred or became inevitable? If just before that climax only one party had the power to prevent the catastrophe, and he neglected to use it, the legal responsibility is his alone. If, however, each

had such power, and each neglected to use it, then their negligence was concurrent and neither can recover against the other." (p. 536.)

The two decisions, Arnold and Dyerson, established the law in precise accord with the quotations from the treatise referred to, and the principles enunciated have been approved and applied many times. Typical cases recognizing duty to discover helpless peril are: *McMahon v. Railway Co.*, 96 Kan. 271, 150 Pac. 566; *Atherton v. Railway Co.*, 107 Kan. 6, 190 Pac. 430; *Morlan v. Hutchinson*, 116 Kan. 86, 225 Pac. 739; and *Muir v. City Railways Co.*, 116 Kan. 551, 227 Pac. 536.

Typical cases of continuing negligence are: *Railway Co. v. Bentley*, 78 Kan. 221, 227, 93 Pac. 150; *Marple v. Railway Co.*, 85 Kan. 705, 118 Pac. 692; *Coleman v. Railway Co.*, 87 Kan. 190, 123 Pac. 756; *Maris v. Street Railway Co.*, 98 Kan. 205, 158 Pac. 6; and *Goodman v. Kansas City, M. & S. Rld. Co.*, 137 Kan. 508, 21 P. 2d 322.

In the case last cited plaintiff drove his automobile on an interurban railroad track in front of an oncoming car and did not have time to get across. He invoked the doctrine of last clear chance. It was held the doctrine of last clear chance did not apply. Plaintiff's negligence continued up to the time of the collision. To show that the doctrine of last clear chance did not apply, decisions of this court were collated, and the elements of the doctrine were stated as follows:

"(1) Plaintiff, by his negligence, placed himself in a position of danger; (2) that his negligence had ceased; (3) that defendant seeing plaintiff in a position of danger, or by the exercise of due care should have seen him in such position, by exercising due care on his part had a clear chance to avoid injuring plaintiff; (4) that defendant failed to exercise such due care, and (5) as a result of such failure plaintiff was injured." (p. 512.)

This statement is open to criticism in that in (3) the term to be defined is used in the definition whereby a special slant is given to the definition. "Clear" chance must still be defined, and a chance is a clear chance if exercise of vigilance would have discovered the helpless peril and avoided the injury. Besides that, to make a scientifically complete and accurate definition, the statement should be expanded. The following is the carefully worked out statement of the American Law Institute:

"Section 15. Defendant's Last Clear Chance. A plaintiff who has negligently subjected himself to a risk of harm from the defendant's subsequent negligence may recover for harm caused thereby if, immediately preceding the harm,

(a) the plaintiff is unable to avoid it by the exercise of reasonable vigilance and care and

(b) the defendant

   (i) knows of the plaintiff's situation and realizes the helpless peril involved therein; or

   (ii) knows of the plaintiff's situation and has reason to realize the peril involved therein; or

   (iii) would have discovered the plaintiff's situation and thus had reason to realize the plaintiff's helpless peril had he exercised the vigilance which it was his duty to the plaintiff to exercise, and

(c) thereafter is negligent in failing to utilize with reasonable care and competence his then existing ability to avoid harming the plaintiff." (Restatement, Torts [Tent. Draft No. 10], § 15.)

To complete the subject of last clear chance the next section of the Restatement, relating to negligently inattentive plaintiff, should be given.

"Section 16. Last Clear Chance—Negligently Inattentive Plaintiff. A plaintiff who, by the exercise of reasonable vigilance, could have observed the danger created by the defendant's negligence in time to have avoided harm therefrom, may recover if, but only if, the defendant

(a) knew or had reason to know of the plaintiff's situation, and

(b) realized or had reason to realize that the plaintiff was inattentive and therefore unlikely to discover his peril in time to avoid the harm." (Restatement, Torts [Tent. Draft No. 10], § 16.)

The case of *Maris v. Street Railway Co.*, 98 Kan. 205, 158 Pac. 6, has been cited as one of continuing negligence. In that case a motorcycle rider collided with a street car and was thrown under the running board of the car and dragged some distance. The jury found plaintiff was negligent in various respects. The only negligence attributed to defendant was failure to see plaintiff before the collision occurred. The syllabus reads:

"In an action to recover damages for injuries resulting from a collision between a motorcycle upon which plaintiff was riding and a street car of the defendant the doctrine of 'the last clear chance' does not apply where the negligence of the defendant is predicated upon the theory that defendant should have discovered the plaintiff's danger in time to have avoided the injury, but did not in fact discover it." (Syl. ¶ 2.)

In the opinion it was said:

"We deem it unnecessary to enter into a discussion of the doctrine of 'the last clear chance.' It was relied upon in the petition and is urged here, but the doctrine finds no room for application to the situation presented by the facts determined by the jury. The plaintiff's own negligence extended up to and actually contributed to his injury. There was no new breach of duty by the motorman subsequent to plaintiff's negligence." (p. 208.)

The opinion then cited the Dyerson case and other cases to show the doctrine of last clear chance does not apply when plaintiff's negligence continued to the time of injury. Among the cases cited were the Marple case and the Coleman case, listed above as continuing-negligence cases. The opinion then said:

"The theory upon which plaintiff seeks to support the doctrine is that the motorman ought to have discovered the perilous situation of the plaintiff in time to have avoided the injury. In *Coleman v. Railway Co.*, supra, and in *Marple v. Railway Co.*, supra, it was held that the doctrine never applies where the negligence of the defendant is predicated upon the theory that defendant should have discovered plaintiff's danger in time to have avoided the injury but did not in fact discover it." (p. 209.)

Neither the Marple case nor the Coleman case held anything even remotely resembling what is stated here. Both cases were continuing-negligence cases. In each case the trial court had included in the instructions to the jury an element of the inapplicable doctrine of last clear chance—duty to discover peril. Since the jury might think this would warrant recovery by a plaintiff whose negligence continued to the very moment of collision, the instructions were held erroneous. There is no hint in either opinion that duty to discover peril is not an element of the last-clear-chance doctrine, and the Dyerson case, which settled the doctrine and its limitation in this state, was cited and relied on in both the Coleman and Marple cases. The Marple decision was *per curiam*. It was cited and relied on in the Coleman case, and the syllabus in the Coleman case tells just what was there decided:

"A railway company is not liable for injuries suffered by a person in attempting to pass over its track at a street crossing merely because its employee managing the train ought, in the exercise of reasonable care, to have discovered his perilous situation and stopped the train, where his own negligence operating at the same time contributed to produce the injury.

"The doctrine of the last clear chance does not apply so long as the parties are concurrently negligent." (*Coleman v. Railway Co.*, 87 Kan. 190, 123 Pac. 756.)

All the opinion in the Maris case professed to do was to tell what was held in the Marple and Coleman cases. The misstatement of what was held did not affect what was actually held, nor change the law in any respect, and the court has never regarded the Maris case as changing the law.

In the Atherton case, decided in 1920, four years after the Maris case, a last-clear-chance effort was made by distinguished counsel

to take duty to discover peril out of the last-clear-chance doctrine. The syllabus reads:

"The trial court correctly charged that after plaintiff's truck was negligently driven between the street-car tracks and the plaintiff was in a position of peril and his own negligence had ceased, the defendant would be liable if it saw or by the exercise of ordinary care would have seen him in such position in time to avoid injuring him, and failed to do so."

In the opinion the court stated the following theorem, which it proceeded to demonstrate by reference to authority:

"The rule is so firmly fixed in this state and so thoroughly supported by the great weight of authority that it cannot now be changed." (*Atherton v. Railway Co.*, 107 Kan. 6, 8, 190 Pac. 430.)

Now the only fault with the syllabus and the concluding portion of the opinion in the Maris case was that they omitted to express what was implicit in both—the controlling fact that plaintiff's negligence continued to the moment of collision; and all that is necessary to make the syllabus in the Maris case state the law correctly is to add to it the concluding sentence of the first syllabus in the Coleman case relating to concurring negligence.

In the opinion in this case on the former appeal the contention of counsel for defense that there is no duty to discover peril was stated, and counsel's citation of the Maris case in support of the contention was noted. The facts of the Maris case and the holding as expressed in the syllabus were stated. The court then said:

"However, we think this point of law is not important in this case, because the bus driver testified that he saw the Dodge in front of him before it had quit moving." (*Leinbach v. Pickwick Greyhound Lines*, 135 Kan. 40, 45, 10 P. 2d 33.)

The result is the court did no more than present fully counsel's point. The decision in the Maris case was neither approved nor disapproved, because the bus driver's testimony took the point out of the case. Under these circumstances the contention that the imperfectly phrased syllabus of the Maris decision is the law and became the law of this case at the second trial is wholly without merit.

The jury awarded plaintiff damages as follows:

| | |
|---|---:|
| For destruction of car | $500.00 |
| For medical services | 354.60 |
| For death of his wife | 7,500.00 |
| For personal injuries | 27,000.00 |
| Total | $35,354.60 |

It would unduly prolong this opinion, and be of interest to no one except the parties, to describe the consequences of plaintiff's injuries and to state other pertinent facts bearing on the reasonableness of the award of damages. There is no indication the verdict was the result of passion or prejudice. The court is of the opinion the award for personal injuries was too large, and the majority of the court is of the opinion that item of damages should be reduced to $20,000. Other items of the verdict are approved.

The foregoing disposes of the merits of this controversy. Denial of a continuance was within the discretion of the district court, which was not abused. The motion for change of venue was without merit. The motion for new trial was properly denied.

The judgment of the district court is modified, provided plaintiff assent to the modification, by reducing the total amount of the judgment to $28,354.60. As modified, the judgment is affirmed. If, however, assent to modification be not expressed to this court within twenty days, the cause will be remanded to the district court for a new trial of the single issue of damages for personal injury to plaintiff.